IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KAREN LYNN PENNINGTON,

Plaintiff,

v.                                        Civil Action No. 1:11CV78
                                          (The Honorable Irene M. Keeley)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant," and sometimes "Commissioner") denying the

Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.

The matter is awaiting decision on cross motions for summary judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I.  PROCEDURAL HISTORY

Karen Lynn Pennington ("Plaintiff) filed an application for DIB on April 4, 2006, [1*] alleging

disability since July 1, 2002, due to fibromyalgia and chronic fatigue (R. 268, 274, 309).  Plaintiff's

applications were denied at the initial and reconsideration levels (R. 153,154).  Plaintiff requested

a hearing, which Administrative Law Judge Randall W. Moon ("ALJ") held on May 13, 2008 (R.

104-52).  Plaintiff, represented by Randy Black, and Vocational Expert ("VE") Eugene Czuczman

testified.  On September 23, 2008, the ALJ entered a decision finding Plaintiff was not disabled

---

[*1] Plaintiff's date last insured (DLI) is June 30, 2006.  She therefore must prove she was
disabled on or before that date.  Johnson v. Barnhart, 434 F.3d 650 (4th Cir. 2005).

because she could perform light work (R. 158-68). Plaintiff timely filed a request for review to the Appeals Council, and, on March 20, 2009, the Appeals Council granted Plaintiff's request for review, finding the ALJ's decision did not "contain an adequate evaluation of the treating and examining source opinions." The matter was remanded to the ALJ with instructions to "[g]ive further consideration to the treating and nontreating source opinions pursuant to the provisions of 20 CFR 404.1527 and Social Security Ruling 96-2p and 96-5p and explain the weight given to such opinion evidence. . . ." (R. 170-71). The ALJ conducted a second hearing on June 16, 2009, at which Plaintiff, represented by Jennifer Walker, and VE Czuczman testified (R. 48-99). On October 28, 2009, the ALJ issued a decision finding Plaintiff was not disabled because there was work in the national and local economies, at the sedentary level, Plaintiff could perform (R. 26-43). Plaintiff timely filed a request for review to the Appeals Council, which was denied, making the ALJ's decision the final decision of the Commissioner (R. 4-8).

## II. FACTS

Plaintiff was born on March 3, 1973, and was 33 years old at the time of her application and 36 years old at the time of her second administrative hearing (R. 54, 268). She has a high-school education and past relevant work as a nurse assistant (R. 59, 310).

On May 1, 2000, Dr. G.P. Naum III, DO, noted that Plaintiff's "extensive labs and x-rays . . . were all normal with the exception of mild scoliosis to the lumbosacral area." Plaintiff's examination was normal. Dr. Naum found "all 18 fibromyalgia tender points [were] tender" and diagnosed fibromyalgia, "by history" (R. 413). In addition to fibromyalgia, Dr. Naum diagnosed Plaintiff with hypoglycemia on May 17, 2000 (R. 411).

Plaintiff's fibromyalgia was described through 2001, as sometimes "improving," but for the

most part, "uncontrolled," and "persistent". (R. 407-09).

On April 1, 2002, Plaintiff informed Dr. Naum she had been "'feeling pretty good.'" Her examination was normal (R. 383). Dr. Naum prescribed Xanaflex, Effexor, Phrenalin, Synthroid, and Oxy IR (R. 415).

On May 2, 2002, Plaintiff presented to Dr. Naum with complaints of fatigue and uncontrolled pain (R. 382). Dr. Naum prescribed Zanaflex, Provigil, methadone, Effexor (R. 415). Dr. Naum referred her to and scheduled an appointment with doctor Mark Pellegrino, M.D., "one of the nation's leading experts on fibromyalgia. In fact, he even has the condition himself."[2] Plaintiff was scheduled for a June 13, 2002, appointment with Dr. Pellegrino.

Plaintiff's alleged onset date is July 1, 2002.

On July 15, 2002, Dr. Naum noted Plaintiff's fibromyalgia symptoms were "fairly stable at this time" (R. 382). Dr. Naum prescribed Phenalin and methadone (R. 415). It was noted: "Appointment with Dr. Pelligrino [sic] now set up for 09/06/02."

On September 20, 2002, Plaintiff presented to Dr. Naum for follow up examination. Her examination was normal; Dr. Naum found Plaintiff's "[f]ibro appear[ed] to be somewhat stable on exam today. Is managing her medications very well" (R. 381). Plaintiff told the doctor that she had been unable to see Dr. Pellegrino because her husband would not take her. Dr. Naum would try to reschedule the appointment. Meanwhile, Plaintiff was to "come to the seminar next week." Dr. Naum prescribed Norco, methadone, Phrenalin, Synthroid, and Effexor (R. 415).

On October 31, 2002, Plaintiff presented to Dr. Naum for follow up examination. She stated she felt "a lot (sic) better" (R. 381). She appeared to be doing better with the combination of

---

[2] Http://www.ohiorehabcenter.com (Accessed January 19, 2012.)

3

Effexor and Provigil, however Phrenilin "no longer help[ed] her headaches." She wanted to take an over-the-counter sudafed/acetominophen medication, and was advised to take Advil Cold and Sinus instead. Plaintiff's vital signs were stable; heart rate and rhythm regular; and lungs were clear. Dr. Naum noted Plaintiff was "[h]aving a better day as far as pain and she curled her hair and put on makeup, which [was] a big step for her." He diagnosed "[s]ome improvement in fibromyalgia" (R. 380-81). Dr. Naum prescribed methadone, Synthroid, Effexor, and Norco (R. 415). Plaintiff was "await[ing] appointment with Dr. Pellagreeno" [sic].

There is no record that Plaintiff ever presented to Dr. Pellegrino. A review of the record shows no treatment or examinations for the next 10 months.

On August 25, 2003, Plaintiff presented to Dr. Naum with complaints of leg cramps at night, which she had experienced for two months. Dr. Naum noted Plaintiff was experiencing a "[v]ery difficult domestic situation at present." Plaintiff was not taking her prescribed medication; she was taking only over-the-counter Advil and Tylenol instead. Her vital signs were stable; her heart was regular; her lungs were clear. He diagnosed fibromyalgia, depression, and hypothyroidism (R. 379). Dr. Naum prescribed Synthroid, Effexor and Cefzil (R. 415).

There are no records of any treatment from August 25, 2003, until February 9, 2007, a span of 3 ½ years.

Plaintiff filed her application for DIB on April 4, 2006.

A Disability Determination Examination was completed of Plaintiff by Dr. Gabriel Sella of the West Virginia Disability Determination Service on June 6, 2006. Plaintiff stated she had fibromyalgia, chronic fatigue, anxiety, and depression. She took no prescription medication, only using over-the-counter Tylenol and Advil. Plaintiff reported she did not drink alcohol; she smoked

one pack of cigarettes a day; she drank ten (10) cups of coffee per day. Plaintiff last worked in March, 2000, as a nursing assistant (R. 420).

Upon examination, Plaintiff weighed one-hundred, forty-two (142) pounds; she was five (5) feet, five and one-half (5 ½) inches tall (R. 420). Plaintiff's ranges of motion showed a "number of non physiological responses." Plaintiff could walk without difficulty; she could get up on and down from the examination table without difficulty. She "performed the tandem, Rhomberg, heel walking, tiptoe walking, as well as squatting without any major problems." Plaintiff's judgment and insight were normal; her recent and remote memories were good; she was oriented, times three (3). Her mood and affect showed "some depression." Dr. Sella's examinations of Plaintiff's skin, HEENT, neck, lymphatic system, and gastrointestinal system were normal (R. 421-22). Plaintiff's cardiovascular exam was normal except for mildly decreased peripheral pulses. Plaintiff's chest examination showed mildly increased AP diameter; her respiratory examination showed decreased inspection, percussion, palpation, and auscultation (R. 421). Dr. Sella's neurological examination showed "[p]ossible minimal motor decrease" and mildly depressed mentation. Plaintiff's cranial nerves were normal as were her brachial plexus and lumbosacral plexus. Upon joint testing and neuromuscular testing, Plaintiff had "two trigger points in the gluteus major area, and she ha[d] a generally tender back, but no trigger points." Plaintiff was "examined on the 18 trigger points, the tender points reliably defined by ACR, as defining fibromyalgia, and she ha[d] negative findings." She was on no medication (R. 422).

Dr. Sella noted that the "[d]iscussion[s] of the four complaints really refer[red] to fibromyalgia symptoms." Plaintiff was "diagnosed by an unknown physician with possible fibromyalgia in the year 2000. The diagnosis was carried on to her new physician in the same year,

who basically stated that she came to him already with that diagnosis. She was tried by him on various medications with no particularly good result. She continues to complain of generalized pain and fatigue, as well as anxiety and depression. The four should be taken together as pertaining to the same syndrome. . . . At the present time, the examinee is not taking any medication and does not do any physical or occupational therapy. She has not learned any new profession in the six years that she has had this condition. . . ." Dr. Sella noted that "[i]n terms of work-related abilities, [Plaintiff] can sit, she can stand occasionally, walk occasionally, and lift and carry light weights occasionally, handle objects occasionally, and speak, hear, and travel. It is clear that she needs further investigation and diagnosis as well as appropriate treatment for her condition" (R. 422).

Holly Coville, M.A., Ed.S., completed an Adult Consultative Evaluation Report of Plaintiff for the West Virginia Disability Determination Service on June 16, 2006. Plaintiff informed Ms. Coville that she had been diagnosed with fibromyalgia in 2000 by a "female doctor, whose name she could not recall" (R. 426). Plaintiff stated "'Dr. Naum [said] I'm depressed. I have chronic fatigue syndrome'" (R. 426-27). Plaintiff reported daily pain "through many parts of her body." Plaintiff described her pain as "dull or . . . chronic." Plaintiff reported sporadic "sharp pains and . . . burning sensation." Plaintiff stated she saw "black specks in her right eye." Plaintiff stated she could not sit or stand for long periods of time (R. 427).

Plaintiff reported the following symptoms: poor sleep; fluctuating appetite; increased crying; poor energy level; "up and down" mood for two (2) weeks; afraid of heights, high bridges, long tunnels and spiders; no panic symptoms; feelings of hopelessness, worthlessness, withdrawal, guilt, and helplessness; and "trouble" concentrating. Plaintiff stated she had had suicidal thoughts at the "first of this year." Plaintiff stated she had received outpatient mental counseling treatment from

Nancy Georges; she medicated with Pamelor and Paxil, which "did not help." Plaintiff's medical history was as follows: "reportedly diagnosed with fibromyalgia and chronic fatigue syndrome"; had medicated with Oxycontin, Demerol, Percocet, and "skin patches for pain"; smoked one (1) pack of cigarettes per day; drank one (1) pot of coffee per day; currently medicated with over-the-counter medications only (R. 427-28). Plaintiff reported she did not have health insurance to pay for prescription drugs (R. 428).

Plaintiff graduated high school and attended college. She had a driver's license. Plaintiff worked ten (10) years as a nursing assistant; Plaintiff quit that profession due to "physical pain." Plaintiff reported she had three children, aged eighteen (18), twelve (12), and nine (9). She had been married for twelve (12) years (R. 428).

Plaintiff's mental status examination showed the following: she was ambulatory; her speech was relevant and coherent; she was oriented, times four (4); her mood was depressed and anxious; her affect was consistent with her mood; Plaintiff's concentration, thought process and content, perception, insight, judgment, immediate and remote memories, persistence and pace were within normal limits; her recent memory was moderately deficient; her psychomotor activity was mildly elevated; she had no suicidal or homicidal ideations (R. 428-29). Plaintiff's social functioning was within normal limits (R. 429).

Plaintiff reported she completed "miscellaneous things around her home and watche[d] television." Plaintiff could not "cook as often as she used to and has her ability to take care of her children." Plaintiff's children and husband "help[ed] her frequently." Plaintiff could not mop or scrub floors or the bathtub. Plaintiff sometimes needed assistance bathing. Plaintiff and her family dined out once per week "if she [felt] good enough." She grocery shopped. Plaintiff stated her

husband did "most of the activities around" the home (R. 429).

Ms. Coville diagnosed major depressive disorder, recurrent, moderate. Plaintiff's prognosis was fair; she could manage benefits (R. 429).

On June 29, 2006, G. David Allen, Ph.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff's impairment, affective disorder, was not severe (R. 431). Dr. Allen noted the following symptoms: anhedonia, sleep disturbances, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide (R. 434). Dr. Allen found Plaintiff had mild limitations in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, and pace (R. 441).

On June 30, 2006, an agency reviewer completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations, noting that she was not medicated for any condition and current physical findings were all normal (R. 445-52).

Plaintiff's date last insured was June 30, 2006. Her application was denied at the initial level that same date. Plaintiff filed a Request for Reconsideration on July 15, 2006.

On November 2, 2006, Jim Capage, Ph.D., reviewed and affirmed the June 29, 2006, Psychiatric Review Technique completed by Dr. Allen (R. 453).

On November 8, 2006, James Binder, M.D., reviewed and affirmed the June 30, 2006, Physical Residual Functional Capacity Assessment completed by the state agency reviewer (R. 454).

Plaintiff's application was denied at the reconsideration level on November 9, 2006. Plaintiff requested an Administrative Hearing on December 19, 2006.

On February 9, 2007, Plaintiff presented to Dr. George "Bunny" Naum.[3] She had not been treated by any health care provider in 3½ years. Plaintiff stated she had not been to a doctor "due to no insurance." Plaintiff rated her pain at seven (7) on a scale of one-to-ten (1-10) (R. 466, 488). She was taking only over-the-counter medications. Dr. Naum stated her trigger points "seem[ed] to be authentic," but noted this was not his field of expertise. He prescribed an antidepressant, sleep aid, and pain medication, and advised Plaintiff to see her previous doctor (his son, "Jeep" Naum) at her next visit (R. 467).

On March 29, 2007, Plaintiff reported to Dr. Naum III, her previous doctor, that her medications were working ok, although her pain was still at a level 7 out of 10. She also reported, however, she "ha[d]n't taken pain meds very often." The doctor had a "long talk" with her "about staying ahead of fibro pain." Her Lexapro, Ultram, Lunesta, and Fioricet were refilled (R. 467).

On April 26, 2007, Plaintiff reported that "meds help[ed] with" headaches "most of the time" and Lunesta "help[ed] with sleep." Plaintiff reported left hip pain that "may travel to some other joint." Upon examination, Plaintiff had "mild discomfort" with range of motion testing of her left knee (R. 464, 505). Her prescriptions were refilled (R. 467, 475, 505).

On June 6, 2007, Plaintiff presented to Dr. Naum with complaints of wrist pain. Plaintiff described this pain at a level six (6). She reported "some retrograde amnesia" with Lunesta, and was told to make sure she was getting 7-8 hours of sleep on this medication. Plaintiff's examination was normal. Her condition was listed as "stable" (R. 463, 486). Her prescriptions were refilled (R. 467, 475).

---

[3]The claim was at first confused by the fact that this Dr. George Naum, M.D., was the father of the doctor, George Naum, III DO, Plaintiff had seen previously. The confusion was cleared up by the ALJ at the hearing.

On October 3, 2007, Plaintiff reported to Dr. Naum that she had pain in her knee, hip and elbow. Plaintiff's pain was reported to be six-to-eight (6-8) on a scale of one-to-ten (1-10) (R. 461). Plaintiff stated "Ultram [did] not provide her with much relief." Lunesta had been effective in helping her sleep, but it had "not been working as well lately." Plaintiff stated Lexapro was "working well." Plaintiff treated her migraine headaches with Fioricet; that medication "work[ed] well." Upon examination, Plaintiff was oriented, times three (3), and in no acute distress. Plaintiff's gait was normal; she had good ranges of motion of her cervical, thoracic and lumbar spine. Dr. Naum detected "multiple tender areas" in Plaintiff's thorax and lower spine; there was no spasm. Plaintiff's affect was appropriate; she made good eye contact; her thought process was "well ordered." Plaintiff was diagnosed with fibromyalgia, chronic generalized musculoskeletal pain, anxiety, depression and insomnia.

Dr. Naum noted Plaintiff took only one Ultram, and that on an as-needed-basis, "for significant pain." He advised her to take two rather than one. Plaintiff's dosage of Lunesta was increased and she was given samples of that medication (R. 462, 485, 504). She was prescribed Lexapro, Ultram, Lunesta, and Fioricet (R. 467, 475, 504).

On December 20, 2007, Plaintiff was notified that an administrative hearing was scheduled for January 15, 2008. Plaintiff acknowledged receipt of the notice on January 2, 2008, stating she wished to proceed without counsel.

On January 3, 2008, Plaintiff reported to Dr. Naum that she was experiencing mid-back and shoulder pain, as well as neck pain "since [being involved in an automobile] accident;" however, she wanted "no oral meds for pain" (R. 460, 483). Her prescriptions were refilled (R. 467, 475).

For unexplained reasons, the hearing was not held on January 15, 2008.

On January 24, 2008, Dr. Naum wrote a letter, addressed to "Dear Sir/Madam," in reference to "Total Disability of Karen Pennington." Dr. Naum wrote he had been Plaintiff's doctor for several years. He wrote that Plaintiff had "tried to overcome her physical and mental disabilities" in order to work, but "no matter how sedentary or menial, she has been unable to do so." Dr. Naum opined Plaintiff suffered from depression, post-traumatic stress disorder, and fibromyalgia. Dr. Naum wrote that Plaintiff experienced "waxing and waning periods of diffuse, fleeting and often excruciating pain" due to fibromyalgia. Dr. Naum wrote that Plaintiff experienced "days where not only [was] it difficult for her to do her ADLs, but she ha[d] trouble even getting out of bed." The pain, which could be "unrelenting," could "deepen depression."

Dr. Naum wrote that he was an "expert on this subject because [he] [was] certified in pain medicine and an expert in the treatment of fibromyalgia."

Dr. Naum wrote that Plaintiff experienced chronic migraine headaches, "often two to three a week as well as sleep disorder, both of which are often associated with fibromyalgia" (R. 457). He noted that Plaintiff's pain was between "6-8 on her visits." Plaintiff had been in an automobile accident recently and experienced whiplash, "further exacerbating her pain." Additional treatment had been done which was not optimal in treating "this exacerbation that can last from months to over a year or longer." Dr. Naum wrote that Plaintiff's "case should be investigated further so that she can get what she qualifies for and that is full, total disability benefits." He opined Plaintiff had been disabled "at least prior to 2005" (R. 458).

Dr. Naum wrote:

Through personal courage that I admire, Mrs. Pennington has decided to control her pain with relatively mild analgesics which often do not do the job. You see she has children and is very concerned about meeting their needs, which she feels would be interfered with by higher potency medications which can sometimes be mind altering.

11

On February 13, 2008, Plaintiff presented to Dr. Naum with complaints of mid-back, shoulder, and neck pain. Plaintiff rated her pain at six (6) or seven (7) on a scale of one-to-ten (1-10). Plaintiff stated she had "tried Duragesic patches, Celebrex, Oxycontin, Percocet, and Vicodin – nothing working." It was noted that Plaintiff "had spell w/no ins." Dr. Naum noted Plaintiff was "on fibromyalgia" medication, she had been in an automobile accident, her pain "move[d]," and her pain was "not specific constant pain." Plaintiff's range of motion in her neck was normal (R. 459, 484). She was prescribed Lexapro, Ultram, Lunesta, and Fioricet (R. 467, 475).

Plaintiff's hearing was rescheduled to May 13, 2008. She appointed counsel to represent her on March 6, 2008. On May 9, 2008, Dr. Naum completed a Fibromyalgia Impairment Questionnaire, reporting Plaintiff's date of first treatment as February 9, 2007; her most recent examination was April 18, 2008; he treated her on a monthly basis. Dr. Naum listed depression, insomnia, and chronic, daily headaches as other diagnosed impairments. Dr. Naum opined Plaintiff's prognosis was fair to poor (R. 468). Dr. Naum noted the following clinical findings to support his opinions: "[d]iffuse pain, fleeting, moving, multiple tenderpoints (sic). Pain most notably at neck and around shoulder area. Cognitively challenged on questioning, speech slow. On many visits lethargy appeared to be incapacitating. Periarticular spasm multiple areas including shoulders (,) hips and knees. Notable allodynia of neck, shoulders, arms, low back and both lower extremities" (R. 468-69). The laboratory and diagnostic test results on which Dr. Naum relied to formulate his opinion were as follows: Plaintiff "was . . . [ruled out] for any other rheumatic disorder. X-rays showed no arthritis and the (sic) including (sic) a full joint survey." Dr. Naum listed the following primary symptoms: insomnia, incapaciting fatigue and pain in multiple areas all consistent [with] fibromyalgia." Dr. Naum opined Plaintiff's impairments and functional limitations

were "reasonably consistent" with her physical and/or emotional impairments (R. 469). Dr. Naum identified Plaintiff's pain as being located, bilaterally, in her lumbosacral spine, cervical spine, thoracic spine, chest, shoulders, arms, hands, fingers, hips, legs, knees, ankles, and feet (R. 469-70). Dr. Naum reported that Plaintiff experienced pain on a daily basis and the frequency and duration during each day varied. Dr. Naum listed Plaintiff's pain as moderately severe. He listed the following medications taken by Plaintiff and their side effects: Lexapro, weight gain, sedation, sexual dysfunction; Ultram, ineffectiveness, fatigue; Lunesta, ineffectiveness, excessive sleepiness; Fioricet, sedation, ineffectiveness, worsening of cognitive function. Dr. Naum noted he had not substituted other medications in an attempt to reduce the side effects. Dr. Naum opined Plaintiff's symptoms had lasted or were expected to last for more than twelve (12) months. Dr. Naum opined Plaintiff was not a malingerer (R. 470). He opined Plaintiff could sit, stand and/or walk for one (1) hour or less in an eight (8) hour work day. It was "necessary or medically recommended" that Plaintiff not sit, walk or stand continuously at work; Plaintiff would have to rise from a seated position every fifteen (15) minutes and not sit again for thirty-to-forty (30-40) minutes. Dr. Naum found Plaintiff could occasionally lift or carry five (5) pounds or less and never lift or carry any higher weights (R. 471).

Dr. Naum opined Plaintiff was incapable of "even 'low stress' jobs" due to her "symptoms and explanation thereof" (R. 471-72). Dr. Naum found that emotional factors of "[d]epression and anxiety due to the limitations this disease presents increase[d] her stress which [made] the symptoms worse." Dr. Naum opined Plaintiff would have to take frequent breaks during an eight (8) hour work day for "at least 30 minutes." She would have "'good days and bad days'" and would be absent more than three (3) times per month (R. 472). Plaintiff would need to avoid wetness, temperature

13

extremes, pushing, pulling, humidity, kneeling, bending, and stooping (R. 472-73). Dr. Naum opined Plaintiff was "not and [would] not be capable of any gainful employment now or in the future" (R. 473).

At the first administrative hearing, on May 13, 2008, Plaintiff's counsel explained that the 3 ½ year break in treatment was due to Plaintiff being without medical insurance (R. 107). She said just one of her medications cost $100.00 per month. The ALJ asked her if she had tried to locate a place, such as "Health Right," for treatment, or if she tried any other place to get medications, to which she replied that she "assumed based on income that [she] probably wouldn't qualify," and therefore did not try to find a less expensive or free provider or any less expensive or free medications. Instead she "self-medicated" at home with Tylenol and Advil for pain and Benedryl or Nyquil for sleep.

Plaintiff testified she went to see a therapist for a short time in 2002 or 2003, but had not seen one since then (R. 145).

Plaintiff testified that at the time of her date last insured (2006), she would go grocery shopping, typically at Kroger's (R. 131). She mostly went with her husband, but sometimes with her children. She carried only light bags into the house. Her washer and dryer were in the basement. She did not carry the laundry down or up the stairs, but did go downstairs and put them in the washer. A daughter or her husband then switched them over to the dryer. They would also bring the laundry back upstairs.

On August 25, 2008, Dr. Naum examined Plaintiff. He noted her "fibromyalgia [was] not stable at present." Plaintiff's pain was seven (7) on a scale of one-to-ten (1-10). Plaintiff's examination was normal except for the presence of diffuse myalgias and periarticular spasm with

hyperesthesia in her head, neck, spine, ribs, pelvis, and extremities. Plaintiff was neurologically stable. She was diagnosed with uncontrolled fibromyalgia; diffuse chronic pain, unstable; depression; insomnia, stable; chronic daily headache, stable. Dr. Naum prescribed Ultram, Lexapro, Lunesta, and Fioricet (R. 475, 501-02).

On February 11, 2009, six months later, Plaintiff presented to Dr. Naum for follow up treatment for "generalized pain and fibromyalgia." Dr. Naum noted, as subjective findings, that Plaintiff reported her "current meds [were] not as effective as they once were;" however, she also told him she was only taking the Ultram. Plaintiff reported no side effects to her medications, except that they were "less than effective at pain control." Plaintiff specifically denied any "cognitive impairment or other side effect that would interfere with safe operation of a motor vehicle or her activities of daily living." Dr. Naum noted that "[t]en systems reviewed . . . all of which were negative except noted in subjective findings." Plaintiff was alert, times three (3); she was in no acute distress; her gait was normal; she had minimal difficulty rising from the seated position; she ambulated without difficulty; she had pain with flexion and extension of her head; she had pain with flexion and extension of her neck; she was tender to palpation diffusely throughout her bilateral trapezius muscles; she had no trapezius spasm; she had pain throughout her lower spine region; she had no spasm. Dr. Naum noted that the "[r]emainder of Musculoskeletal and Neurologic are unchanged from previous." Plaintiff's judgment, orientation, memory, abstraction, and calculation were grossly normal. Dr. Naum diagnosed fibromyalgia, chronic generalized myofascial pain, anxiety, depression, insomnia, and chronic headaches. He had a "long discussion" with Plaintiff regarding her current medications and its apparent shortcoming. He discontinued her prescriptions for Lexapro, Fioricet, and Ambien. He recommended she try Neurontin and re-prescribed Lunesta

(R. 475, 477).

On May 26, 2009, Dr. Sella completed a second West Virginia Disability Determination Service Disability Determination Examination of Plaintiff for complaints of fibromyalgia and chronic fatigue.[4] Plaintiff stated she smoked one and one-half (1 ½) packs of cigarettes per day. She drank eight (8) cups of caffeinated drinks daily. Plaintiff medicated with Neurontin, Fioricet, Ambien and Savella (R. 509). Plaintiff's ranges of motion of her shoulders and elbows were normal. Plaintiff's wrist dorsiflexion was normal. Plaintiff could fully extend her hand, make a fist, oppose her fingers. Her upper extremity strength and grip strength was 4/5. Plaintiff's fine manipulation was normal (R. 507). Plaintiff's hips, cervical spine, and lumbar spine ranges of motion were normal (R. 508). Her vital signs were normal (R. 509). Her judgment and insight were normal; she was oriented, times three (3); her memory was normal; she "show[ed] moderate anxiety." Dr. Sella's examinations of Plaintiff's skin, HEENT, neck, lymphatic system, chest, respiratory system, and gastrointestinal system produced normal results. Plaintiff's cardiovascular examination was normal except for "mild cyanosis of both hands and feet." Plaintiff could walk, get up on and down from the examining table, and tandem walk without difficulty. Plaintiff's reflexes, cranial nerves, and mentation were normal; her Rhomberg was negative. Plaintiff's heel walking, toe walking and squatting were painful (R. 510). Dr. Sella noted the following: Plaintiff was a

> thin lady who ha[d] rather hypertrophic musculature with normal tunnels. She had no trigger points. She had multiple tender points, over 18 of them in terms of ruling out or exclusion of the ACR criteria for fibromyalgia. She had complaints of pain in both wrists today. The wrists were not acute or chronic. She had good range of motion, but pain with motion. She also showed in several ways that she had pain in the left hip. The left acetabular area was tender on palpation with normal muscles. Range of motion difficult to perform because of the pain. She had no LS

---

[4]The first was completed in 2006, shortly after Plaintiff's application.

radiculopathy. . . . [Plaintiff] was diagnosed by her family physician with the condition in 1999 or in the year 2000 that she was diagnosed with the combination of both conditions. As it is clear, there is a lot of overlap between fibromyalgia and chronic fatigue. She describe[d] her joint pain as being migratory and today she ha[d] pain in the wrist and in the left hip, but that is not necessarily the situation in which she will be in a couple of days. Her description of the pain is more of her joints pain than of tender points or tender areas and she is describing more a migratory arthritis type of condition, which deserves further evaluation. While she is trustable about the pain, the pain that she is having is not typical at all for either chronic fatigue or fibromyalgia. She was not referred to a rheumatologist and there [was] no documentation on file about any blood work to rule out any rheumatic disease including conditions of migratory arthritis. In terms of work-related abilities, the last time she has worked out of the house as nursing assistant was about nine years ago. She does some work in the house, but sometimes she cannot do it because of fatigue or pain. She can sit, she can stand, she can walk, she can lift and carry lightweight (sic). She can handle light objects. She can speak, hear, and travel. She needs further evaluation of her conditions and she needs rheumatologic opinions. . . . In conclusion, this is a 36-year-old lady with a presenting diagnosis of fibromyalgia and chronic fatigue and clinical evidence of migratory arthritis. She may perform the work-related functions described above (R. 511).

Also on May 26, 2009, Dr. Sella completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). Dr. Sella found Plaintiff could occasionally lift and/or carry up to ten (10) pounds (R. 512). She could sit for fifteen (15) minutes without interruption; stand for twenty-to-twenty-five (20-25) minutes without interruption; and walk for fifteen (15) minutes without interruption. Dr. Sella found Plaintiff could sit for two (2) hours in an eight (8) hour workday; stand for two (2) hours in an eight (8) hour workday; and walk for two (2) hours in an eight (8) hour workday. The form contained a question: "If the total time for sitting, standing and walking does not equal or exceed 8 hours, what activity is the individual performing for the rest of the 8 hours?" Dr. Sella failed to respond to that question. The form was later faxed back to Dr. Sella with an asterisk at that question. Dr. Sella responded that Plaintiff "may sit for another 2 hours . . . ." Plaintiff did not need assistance with ambulation (R. 513). Dr. Sella found Plaintiff could occasionally reach, handle, and finger bilaterally; could frequently feel bilaterally; and could never

17

push/pull bilaterally. Dr. Sella found Plaintiff could occasionally operate foot controls (R. 515). Dr. Sella found Plaintiff could never climb ladders or scaffolds and could never crawl; Plaintiff could occasionally climb stairs and ramps, balance, stoop, kneel, and crouch. Plaintiff had no visual or hearing impairments (R. 516). Dr. Sella found Plaintiff could never be exposed to unprotected heights or vibrations; could occasionally be exposed to moving mechanical parts, operating a motor vehicle, dusts, fumes, odors, pulmonary irritants, extreme heat and cold; and could frequently be exposed to humidity and wetness. Dr. Sella found Plaintiff could be exposed to moderate noise (R. 517). Dr. Sella opined Plaintiff could shop, travel without a companion, ambulate with no assistive device, use public transportation, climb a few steps, prepare a simple meal, care for personal hygiene, and sort, handle and use paper or files. Dr. Sella found Plaintiff could not walk a block at a reasonable pace on rough surfaces (R. 518).

On June 15, 2009, Dr. Naum completed a "Narrative Report on Karen Pennington." Dr. Naum wrote he had treated Plaintiff for several years, except for a time period when she was "unable to see" him "due to financial considerations." Dr. Naum wrote that Plaintiff was "depressed, anxious and had trouble adjusting to changes in her life." Plaintiff was "fraught with appetite disturbances and weight change, sleep disturbances, emotional lability, anhedonia, occas. suicidal ideation, social withdrawal, blunt affect and decreased energy. In light of these symptoms as well as her fibromyalgia, gainful employment has been unrealistic." Dr. Naum wrote that "treatment [was] very difficult" because Plaintiff could not tolerate "many medications." Additionally, "[t]reatment of [Plaintiff's] fibromyalgia ha[d] not lead (sic) to very promising results mainly due to intolerance of medication and inability to exercise." Dr. Naum wrote Plaintiff could not get out of bed on "many days." Plaintiff's complaints included symptoms of "diffuse myalgia, hyperesthesia and allodynia,

hallmarks of fibromyalgia." Plaintiff's ability to exercise was affected by insomnia and lethargy. Dr. Naum wrote Plaintiff did not tolerate Savella, a medication for fibromyalgia. Dr. Naum opined that Plaintiff was completely and totally disabled (R. 521-22).

Also on June 15, 2009, Dr. Naum completed a Psychiatric/Psychological Impairment Questionnaire of Plaintiff. Dr. Naum opined Plaintiff's GAF was fifty-five (55). She was diagnosed with major depression, anxiety, fibromyalgia, and adjustment disorder. Her prognosis was poor (R. 523). Dr. Naum listed the following findings to support his diagnoses: poor memory, appetite disturbance, sleep disturbance, mood disturbance, emotional lability, loss of intellectual ability of 15 IQ points or more, recurrent panic attacks, anhedonia, feelings of guilt/worthlessness, difficulty thinking and concentrating, suicidal ideations or attempts, social withdrawal, inappropriate affect, decreased energy, obsessions or compulsion, and generalized persistent anxiety (R. 524). Dr. Naum listed the following as Plaintiff's primary symptoms: poor memory, appetite disturbance, sleep disturbance, mood disturbance, emotional lability, loss of intellectual ability of fifteen (15) IQ points or more. Dr. Naum listed the following as Plaintiff's frequent and/or severe symptoms: poor memory, appetite disturbance, sleep disturbance, emotional lability, anhedonia, feelings of guilt/worthlessness, difficulty thinking and concentrating, suicidal ideations or attempts, social withdrawal, inappropriate affect, and decreased energy. Dr. Naum wrote that Plaintiff would require intermittent hospitalization and emergency room treatment due to her symptoms (R. 525). Dr. Naum made the following findings as to Plaintiff's mental activities: she was markedly limited in her ability to remember locations and work-like procedures, to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods of time, to perform activities within a schedule, to maintain regular attendance, to be

punctual within customary tolerance, to sustain ordinary routine without supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, to travel to unfamiliar places or use public transportation, and to set realistic goals or make plans independently. Dr. Naum found Plaintiff was moderately limited in ability to understand and remember one or two step instructions, to carry out simple one or two step instructions, to make simple work-related decisions, to interact appropriately with the general public, to ask simple questions or request assistance, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and to be aware of normal hazards and take appropriate precautions (R. 526-28). Dr. Naum found Plaintiff experienced episodes of decompensation or deterioration in work or work-like settings that caused Plaintiff to withdraw from a situation or experience exacerbation or her symptoms. Dr. Naum wrote that "[a]ny kind of perceived stress by [Plaintiff] [made] focus and concentration on task impossible." Dr. Naum noted Plaintiff was moderately limited in her ability to perform basic work related activities. Dr. Naum listed the following medications and their side effects: Fioricet caused lethargy and sleepiness; Neurontin caused lethargy, headaches, and confusion; Mobic caused heartburn and abdominal pain; Lexapro caused occasional lethargy; Ambien caused excessive sleepiness following day and occasional hallucinations (R. 528). Dr. Naum found Plaintiff's psychiatric conditions exacerbated her pain. Dr. Naum opined Plaintiff had a low IQ or reduced intellectual functioning. He noted Plaintiff had

a high school education, "but was not a good student; has trouble understanding and conceptualizing basic questions & instructions." Dr. Naum found Plaintiff was incapable of "even 'low stress'" jobs; he based this conclusion on his "[p]ersistent observation of attempts at gainful employment." According to Dr. Naum, Plaintiff would have good and bad days (R. 529). Plaintiff would be absent from work more than three (3) times per month due to her impairment (R. 530).

At the second administrative hearing, held on June 16, 2009, Plaintiff testified she graduated from high school (R. 59). She last worked in 2000 as a certified nursing assistant (R. 60). Plaintiff testified she stopped working because she could not "continue lifting patients and just the running up and down the halls and taking care of . . . basically [she] couldn't perform [her] duties any longer" (R. 61). She took a leave of absence, but after a year she resigned. The hospital where she worked had not said anything to her about resigning, and she believed that if she were able to return they would have rehired her. She resigned because she had a pension and the family "was not doing very well financially, so to receive my pension I had to resign" (R. 62). She had not looked for any other type of work since 2000.

Plaintiff testified she lived with two (2) daughters, her husband and her mother (R. 54). Her home was one level.[5] She had a driver's license and drove less than one (1) time per week (R. 56-57). She drove to her daughter's school (R. 59). Her husband did most of the shopping (R. 58). Plaintiff stated she attempted to get out of bed when her children woke her in the morning as they left for school, but, if she did not rise then, she rose at 8:00 a.m. (R. 63). Plaintiff watched television, ate breakfast, sat on the porch for ten (10) or fifteen (15) minutes, lay down, and watched

_____

[5]At the time of the first hearing, Plaintiff testified her home had two levels, but her husband had since brought the washer and dryer upstairs from the basement.

television. Plaintiff could put clothes in the washing machine but could not remove them and put them in the clothes dryer (R. 64). Plaintiff testified she had accompanied her daughters to an amusement park but could not walk and could not ride the rides (R. 73). Plaintiff stated she "kind of" had difficulty dressing; if she could not dress, she remained in her pajamas (R. 74). Dr. Naum did not restrict her activities. She did not exercise (R. 75). Plaintiff could wash dishes a "couple days every couple weeks" (R. 76-77). She could sweep floors on a "good day." Plaintiff testified her husband cooked meals that "[took] a lot of preparation," while she prepared meals that were "frozen" (R. 77). Plaintiff testified she "went out to eat" when her sister visited for three (3) or four (4) days (R. 86). Plaintiff stated she could sit for twenty (20) minutes before she had to stand (R. 79). She could stand for twenty (20) or twenty-five (25) minutes; she could walk for twenty-five (25) minutes (R. 80). Plaintiff's ability to sustain activities varied (80-81). Plaintiff smoked and had never attempted to quit smoking (R. 73).

Plaintiff stated "the more [she] walk[ed], the more pain [she] . . . [had] (R. 58). Plaintiff testified she could not grasp clothes in the washing machine to transfer them to the clothes dryer (R. 64). Plaintiff stated her pain was located in her hips, knees and ankles; her pain was located in her joints and muscles (R. 76). Plaintiff described her pain as "dull – like a blunt pain sometimes, or deep" (R. 79).

Plaintiff testified that she bought groceries such as milk and bread or ice cream, only every four to six weeks or so. She said her husband did most of the shopping, and she did not go with him because she had a difficult time going all the way through the store and up and down all the aisles. She testified she had stopped going to the grocery store in about 2000 or 2001.

Plaintiff stated the pain she experienced was caused by fibromyalgia (R. 64). She testified

that she had had medical tests to rule out arthritis and possibly multiple sclerosis and had been diagnosed, in 2000, with fibromyalgia by a doctor whose name she could not recall (R. 64-65). She had been diagnosed with chronic fatigue syndrome (R. 66). Plaintiff listed her symptoms of depression as crying, feelings of worthlessness, and difficulty concentrating and remembering. Plaintiff testified she was not being treated by a therapist or psychologist (R. 82). When asked if she did not see a psychologist due to a lack of insurance for it, Plaintiff said she did have coverage, but did not know a psychologist. She last talked to her doctor about depression "quite a while ago." Plaintiff stated she experienced difficulty sleeping; she slept for four (4) or five (5) hours; and pain interfered with her sleep (R. 83). Plaintiff testified she lay down at least four (4) hours per day (R. 84).

Plaintiff medicated with samples of Lunesta, samples of Savella, Fioricet, and Neurontin (R. 67-69). Plaintiff testified Neurontin reduced the duration of her migraine headaches. Plaintiff testified she visited the doctor once every three (3) months (R. 70). Plaintiff testified she had not been "test[ed] to try to figure out . . . what [her] problem [was] besides fibromyalgia" (R. 72). Massage, shock, and water therapies did not ease her pain (R. 78). She had had physical therapy in early 2000, but not since. Plaintiff testified that Savella caused nausea; Neurontin caused a "feeling of spaciness or feeling like [she was] drunken or on drugs" (R. 80). Plaintiff testified she was not treated by Dr. Naum from 2003 until 2006 because she had no insurance; she medicated with Tylenol, Advil and NyQuil during that time (R. 89).

Plaintiff testified that some of the medications her doctor had prescribed were not covered by her insurance, so her doctor gave her samples or substituted a different medication (R. 69).

The ALJ asked the VE the following hypothetical question:

I want you to assume a hypothetical individual at the sedentary level that would have – with the limitations I gave you of light, but with the additional limitations that the Claimant, if sitting down, would need to be able to change position about once every half hour, would be able to get up and move around for a few minutes, could sit for at least six hours in an eight-hour workday, could stand or walk for at least two hours in an eight-hour workday, but if standing or walking would have to be able to sit down after standing or walking for 15 minutes at a time. Would there be any full-time unskilled jobs that a hypothetical person could do in the local or national economy at the sedentary level? (R. 93).

The VE testified that Plaintiff could perform the work of type copy examiner, laminator, and patcher (R. 93).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Moon made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2006 (R. 28).

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 1, 2002 through her date last insured of June 30, 2006 (20 CFR 404.1571 *et seq.*) (R. 28).

3. Through the date last insured, the claimant had the following severe impairments: fibromyalgia; chronic fatigue; and depression (20 CFR 404.1520(c)( (R. 28).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (R. 36).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(b) except that she is limited to sitting for six hours in an eight hour workday, but for no more than 30 minutes at one time. She can stand and walk for two hours in an eight hour workday, but for no more than 15 minutes at a time. She would be limited to performing simple routine one to three step tasks but not involving high production rates such as in assembly line work or high sales

24

quotas such as in telemarketing work (R. 38).

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565) (R. 41).

7.    The claimant was born on March 3, 1973 and was 33 years old, which is defined as a younger individual age 18-19, on the date last insured (20 CFR 404.1563) (R. 42).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564) (R. 42).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 42).

10.   Through the dated (sic) last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)) (R. 42).

11.   The claimant was not under a disability, as defined in the Social Security Act, at any time from July 1, 2002, the alleged onset date, through June 30, 2006, the date last insured (20 CFR 404.1520(g)) (R. 43).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept

to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (<u>quoting</u> <u>Consolidated</u> <u>Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" <u>Hays</u>, 907 F.2d at 1456 (<u>quoting</u> <u>Laws</u> <u>v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.     The ALJ failed to properly weigh the medical opinion evidence.

2.     The ALJ failed to properly evaluate Plaintiff's credibility.

The Commissioner contends:

1.     The ALJ considered and gave appropriate weight to all medical reports.

2.     The ALJ properly evaluated Plaintiff's credibility.

## C. Date Last Insured

As a threshold matter, there is no dispute that Plaintiff must prove she was disabled on or before her date last insured, June 30, 2006. Further, because she had a final unfavorable decision on June 20, 2002, the relevant time frame is from June 2002 through June 30, 2006. The following are the only records of treatment or examination during the relevant time:

- •     July 15, 2002, Dr. Naum noted Plaintiff's fibromyalgia symptoms were "fairly stable

at this time" (R. 382)"

- September 20, 2002, Plaintiff's examination was normal; Dr. Naum found her "[f]ibro appear[ed] to be somewhat stable on exam today. Is managing her medications very well" (R. 381).

- October 31, 2002, Plaintiff stated she felt "a lot better" (R. 381). She appeared to be doing better with the combination of Effexor and Provigil, however Phrenilin "no longer help[ed] her headaches." She wanted to take an over-the-counter sudafed/acetominophen medication, and was advised to take Advil Cold and Sinus instead. Plaintiff's vital signs were stable; heart rate and rhythm regular; and lungs were clear. Dr. Naum noted Plaintiff was "[h]aving a better day as far as pain and she curled her hair and put on makeup, which [was] a big step for her." He diagnosed "[s]ome improvement in fibromyalgia" (R. 380-81). Plaintiff was "await[ing] appointment with Dr. Pellagreeno" [sic].

- There is no record that Plaintiff ever presented to Dr. Pellegrino. A review of the record shows no treatment or examinations for the next 10 months.

- August 25, 2003, Plaintiff complained of leg cramps at night, which she had experienced for two months. Dr. Naum noted Plaintiff was experiencing a "[v]ery difficult domestic situation at present." She was not taking prescribed medication; she was taking only over-the-counter Advil and Tylenol instead.

- There are no records of any treatment being sought from August 25, 2003, until February 9, 2007, a span of 3 ½ years.

Plaintiff filed her application for DIB on April 4, 2006.

The undersigned finds it significant that at the office visits closest to Plaintiff's DLI, she was found to be "fairly stable," "somewhat stable [while] managing her medications very well," and "felt a lot better" and showed "some improvement." Ten months later, and a year after her DLI, she complained of leg cramps at night which she had had for only two months. She was taking no prescribed medications.

The next examinations of Plaintiff took place after her date last insured and after she filed her applications. They were performed by physicians and psychologists on behalf of the State Agency in order to determine her ability to function.

- June 26, 2006, Plaintiff stated she had fibromyalgia, chronic fatigue, anxiety, and depression. She took no prescription medication, only using over-the-counter Tylenol and Advil. Ranges of motion showed a "number of non physiological responses." Plaintiff could walk without difficulty; she could get up on and down from the examination table without difficulty. She "performed the tandem, Rhomberg, heel walking, tiptoe walking, as well as squatting without any major problems." Plaintiff's judgment and insight were normal; her recent and remote memories were good; she was oriented, times three (3). Her mood and affect showed "some depression." Dr. Sella's neurological examination showed "[p]ossible minimal motor decrease" and mildly depressed mentation. Upon joint testing and neuromuscular testing, Plaintiff had only "two trigger points in the gluteus major area, and she ha[d] a generally tender back, but no trigger points." Plaintiff was "examined on the 18 trigger points, the tender points reliably defined by ACR, as defining fibromyalgia, and she ha[d] negative findings." (Emphasis added). She was

28

on no medication and did not do any physical or occupational therapy (R. 422). Dr. Sella noted that "[i]n terms of work-related abilities, [Plaintiff] can sit, she can stand occasionally, walk occasionally, and lift and carry light weights occasionally, handle objects occasionally, and speak, hear, and travel" (R. 422).

- June 16, 2006, psychologist Holly Coville. Plaintiff was taking only over-the-counter medications, reporting she did not have health insurance to pay for prescription drugs (R. 428). On mental status examination she was ambulatory; her speech was relevant and coherent; she was oriented, times four (4); her mood was depressed and anxious; her affect was consistent with her mood; her concentration, thought process and content, perception, insight, judgment, immediate and remote memories, persistence and pace were within normal limits; her recent memory was moderately deficient; her psychomotor activity was mildly elevated; she had no suicidal or homicidal ideations; and her social functioning was within normal limits (R. 429). Plaintiff reported she completed "miscellaneous things around her home and watche[d] television." Plaintiff could not "cook as often as she used to and has her ability to take care of her children." Plaintiff's children and husband "help[ed] her frequently." Plaintiff could not mop or scrub floors or the bathtub. Plaintiff sometimes needed assistance bathing. Plaintiff and her family dined out once per week "if she [felt] good enough." She grocery shopped. Plaintiff stated her husband did "most of the activities around" the home (R. 429). Ms. Coville diagnosed major depressive disorder, recurrent, moderate. Plaintiff's prognosis was fair; she could manage benefits (R. 429).

- June 29, 2006, G. David Allen, Ph.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff's impairment, affective disorder, was not severe (R. 431). Dr. Allen noted the following symptoms: anhedonia, sleep disturbances, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide (R. 434). Dr. Allen found Plaintiff had mild limitations in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, and pace (R. 441).

- June 30, 2006, an agency reviewer completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations, noting that she was not medicated for any condition and current physical findings were all normal (R. 445-52).

Plaintiff's date last insured was June 30, 2006.

Plaintiff finally went to a treating physician on February 9, 2007, 8 months after her DLI, and 3 ½ years after she had last seen a treating physician. She stated she had not been to a doctor "due to no insurance." Plaintiff rated her pain at seven (7) on a scale of one-to-ten (1-10) (R. 466, 488). She was, however, taking only over-the-counter medications. Dr. Naum stated her trigger points "seem[ed] to be authentic," but noted this was not his field of expertise. He prescribed an antidepressant, sleep aid, and pain medication, and advised Plaintiff to see her previous doctor (his son, "Jeep" Naum) at her next visit (R. 467).

On March 29, 2007, Plaintiff reported to Dr. Naum III, her previous doctor, that her medications were working ok, although her pain was still at a level 7 out of 10. She also reported,

however, she "ha[d]n't taken pain meds very often." The doctor had a "long talk" with her "about staying ahead of fibro pain." Her Lexapro, Ultram, Lunesta, and Fioricet were refilled (R. 467).

On April 26, 2007, Plaintiff reported that "meds help[ed] with" headaches "most of the time" and Lunesta "help[ed] with sleep." Plaintiff reported left hip pain that "may travel to some other joint." Upon examination, Plaintiff had "mild discomfort" with range of motion testing of her left knee (R. 464, 505). Her prescriptions were refilled (R. 467, 475, 505).

On June 6, 2007, almost one year after her Date Last Insured, Plaintiff presented to Dr. Naum with complaints of wrist pain. She described this pain at a level six (6). She reported "some retrograde amnesia" with Lunesta, and was told to make sure she was getting 7-8 hours of sleep on this medication. Her examination was normal. Her condition was listed as "stable" (R. 463, 486).

While the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, he found her statements concerning the intensity, persistence and limiting effect of these symptoms not credible as regards the time at issue, prior to her date last insured of June 30, 2006. The ALJ expressly found that Plaintiff's alleged symptoms were not fully consistent with the objective medical signs and findings set forth in the medical evidence in connection with the period from July 1, 2002 through June 30, 2006. He correctly noted she had sought absolutely no treatment whatsoever between 2003 and 2007. When she finally saw Dr. Naum in 2007, she said she was on no medication, despite complaints of incapacitating pain.

Plaintiff argues: "The fact that Ms. Pennington did not receive treatment for a period of time between 2003 and 2007 cannot be held against her because of her inability to afford treatment (see n. 19, p. 11, supra.)" The footnote cited by Plaintiff is from page 11 of her own brief, and states:

> Although the ALJ made much of the fact that Dr. Naum did not treat Ms. Pennington
> between 2003 and 2007 there is no evidence that Plaintiff's condition improved

during this period of time. More importantly, the record repeatedly notes that the only reason she did not receive treatment was because of her lack of insurance and inability to afford treatment (TR. 466, 521) not because of a lack of severity. SSR 82-59 provides that an inability to afford treatment cannot be held against a claimant. Thus, the ALJ's finding on this point was improper.

Plaintiff's argument is partially correct. Social Security Ruling ("SSR") 82-59 is entitled:

"Failure to Follow Prescribed Treatment." Under that Ruling, cited by Plaintiff, "Justifiable Cause

for Failure to Follow Prescribed Treatment" does include:

> The individual is unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable. Although a free or subsidized source of treatment is often available, the claim may be allowed where such treatment is not reasonably available in the local community. All possible resources (e.g., clinics, charitable and public assistance agencies, etc.), must be explored.

The records to which Plaintiff cites state only that "Pt. wasn't seen due to no insurance" (R.

466) and " there were some years she was unable to see me due to financial considerations." (R.

521). She told psychologist Coville she took only over-the-counter medications because she did not

have health insurance to pay for prescription drugs (R. 428). She told Dr. Naum she had not been

to a doctor "due to no insurance." The lack of insurance alone does not, however, end the

discussion.

At the first Administrative Hearing, Plaintiff's counsel explained that the 3 ½ year break in

treatment was due to Plaintiff being without medical insurance (R. 107). Plaintiff then testified that

just one of her medications cost $100.00 per month. The ALJ expressly asked her if she had tried

to locate a place, such as "Health Right," for treatment, or if she tried any other place to get

medications, to which she replied that she "assumed based on income that [she] probably wouldn't

qualify," and therefore did not try to find a less expensive or free provider or any less expensive or

free medications. Instead she "self-medicated" at home with Tylenol and Advil for pain and

Benedryl or Nyquil for sleep. Plaintiff admittedly did not seek any free community resources, even though she knew they were available. She did not explore all possible resources. Her reasoning for not looking into such resources was that she "assumed based on income that [she] probably wouldn't qualify," meaning her family clearly had income that she considered was above that to qualify. There is no record of her ever having asked her doctor for a less expensive prescription medication, getting on a prescription drug maker list to get prescriptions for free, or even asking for samples. Significantly, after she began seeing her doctor again, after 3 ½ years, he was providing her with samples of prescription medications which her insurance would not cover.

The ALJ therefore correctly stated:

> While the undersigned acknowledges that the claimant lacked insurance coverage during this time, there is no indication that she ever sought treatment for her pain at an emergency room or urgent care center, nor did she seek treatment with any free clinic.

The undersigned finds more significant on this issue the letter written by Plaintiff's treating physician on January 24, 2008, stating:

> Through personal courage that I admire, Mrs. Pennington has decided to control her pain with relatively mild analgesics which often do not do the job. You see she has children and is very concerned about meeting their needs, which she feels would be interfered with by higher potency medications which can sometimes be mind altering.

Importantly, Plaintiff's children would have been 14 and 11 at the time of this letter. They would have been only 9 and 6 at the time she stopped using prescribed medications, and 12 and 9 at the time of her DLI. Although it may indeed be "courageous" that Plaintiff rejected medications that might "do the job," according to her treating physician she was admittedly not taking medications that might control her symptoms due to her desire to "meet the needs" of her children, not because of cost. This statement is also inconsistent with Plaintiff's testimony that her children had to help

her with everything, and that they had to take care of her (R. 82). It also undermines her argument that she didn't take prescription medications only because she had no insurance.

Plaintiff's argument that she did not see any providers or take any prescribed medication is further undercut by her response to the ALJ's questions regarding whether she was seeing a mental health practitioner. She testified she did have insurance coverage to see a psychologist, psychiatrist or therapist, but just "didn't know one."

Based on all of the above, the undersigned finds substantial evidence supports the ALJ's finding that Plaintiff's failure to seek any treatment of her symptoms for 3 ½ years (3 years prior to and 8 months after her date last insured) adversely affects her credibility regarding her pain and limitations.

### D. Opinion Evidence

Plaintiff first argues that the ALJ failed to properly weigh the medical opinion evidence. Defendant contends that ALJ considered and gave appropriate weight to all medical reports. In particular, Dr. Naum's opinion regarding Plaintiff's limitations was entitled to controlling weight; however, "The ALJ states that Dr. Naum's opinions cannot be entitled to controlling weight because they are unsupported by 'objective' neurological findings or loss of range of motion." Plaintiff contends Dr. Naum "specifically identified these types of appropriate findings associated with fibromyalgia in his medical reports and progress notes," and that his opinions are also uncontradicted by other substantial evidence in the record. Plaintiff also argues that the ALJ failed to state what weight he accorded Dr. Naum's opinion, and did not give a rationale for that weight.

Plaintiff further argues that the ALJ's finding that Dr. Sella's opinion supports his RFC finding for sedentary work is contradicted by the record, because Dr. Sella opined that Plaintiff could

sit no more than 4 hours in an 8-hour day. First, Dr. Sella corrected that opinion, stating that Plaintiff could sit an additional 2 hours, for a total of 6 hours. Second, and more importantly, the ALJ specifically noted "this evaluation was performed almost three years after the claimant's date last insured of June 30, 2006, and therefore, the findings have been considered in context with the June 2006 evaluation performed by Dr. Sella." (Emphasis added). Significantly, Dr. Sella was the only physician to see Plaintiff near the time of her date last insured, which was June 30, 2006. Dr. Naum had last seen Plaintiff in 2003. He next saw Plaintiff in March, 2007. Dr. Sella's 2006 findings were that Plaintiff took no prescription medication, only using over-the-counter Tylenol and Advil; ranges of motion showed a "number of non physiological responses;" Plaintiff could walk without difficulty; she could get up on and down from the examination table without difficulty; she "performed the tandem, Rhomberg, heel walking, tiptoe walking, as well as squatting without any major problems;" Plaintiff's judgment and insight were normal; her recent and remote memories were good; she was oriented, times three (3); her mood and affect showed "some depression." she showed "[p]ossible minimal motor decrease;" and mildly depressed mentation.

More significantly, Dr. Sella found Plaintiff had only "two trigger points in the gluteus major area, and she ha[d] a generally tender back, but no trigger points." He examined Plaintiff on the 18 tender points "reliably defined by ACR as defining fibromyalgia, and she had negative findings." (Emphasis added). Notably, Plaintiff was on no medication at the time. Regarding work functioning, Dr. Sella opined that Plaintiff could sit, could stand occasionally, could walk occasionally, could lift and carry light weights occasionally, could handle objects occasionally, and could speak, hear, and travel.

The ALJ accorded significant weight to Dr. Sella's 2006 opinion expressly noting that

examination appeared to be an accurate depiction of Plaintiff's functions "at the time just prior to her date last insured of June 30, 2006." He did, as Plaintiff argues, also accord significant weight to Dr. Sella's 2009 opinion, but expressly noted "this examination was performed almost three years after the claimant's date last insured."

The undersigned therefore finds substantial weight supports the ALJ's according significant weight to Dr. Sella's 2006 opinion.

Regarding Dr. Naum's opinion, Plaintiff is correct that the ALJ did not accord this treating physician controlling weight. First, the ALJ correctly found that Dr. Naum's opinions that Plaintiff was "disabled" were not entitled to controlling weight because they were opinions on an issue reserved to the Commissioner (20 CFR section 404.1527(c)(1)). SSR 96-5p also states:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is 'disabled' or 'unable to work,' or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance. (Emphasis added.)

As part of his 2008 letter, Dr. Naum wrote: Plaintiff's "case should be investigated further so that she can get what she qualifies for and that is full, total disability benefits," and that she had been disabled "at least prior to 2005." In his 2009 letter, Dr. Naum opined that Plaintiff was completely and totally disabled  These opinions are clearly not entitled to controlling weight or even special significance pursuant to the Ruling.

The ALJ also found that Dr. Naum's opinions were not supported by the objective medical

signs and findings detailed in the medical records <u>prior to the date last insured of June 30, 2006.</u>

Plaintiff's alleged onset date is July 1, 2002. On July 15, 2002, Dr. Naum noted Plaintiff's fibromyalgia symptoms were "fairly stable at this time" (R. 382). On September 20, 2002, Plaintiff presented to Dr. Naum for follow up examination. Her examination was normal; Dr. Naum found Plaintiff's "[f]ibro appear[ed] to be somewhat stable on exam today. Is managing her medications very well" (R. 381). On October 31, 2002, Plaintiff presented to Dr. Naum for follow up examination. She stated she felt "a lot (sic) better" (R. 381). She appeared to be doing better with the combination of Effexor and Provigil, however Phrenilin "no longer help[ed] her headaches." She wanted to take an over-the-counter sudafed/acetominophen medication, and was advised to take Advil Cold and Sinus instead. Plaintiff's vital signs were stable; heart rate and rhythm regular; and lungs were clear. Dr. Naum noted Plaintiff was "[h]aving a better day as far as pain and she curled her hair and put on makeup, which [was] a big step for her." He diagnosed "[s]ome improvement in fibromyalgia" (R. 380-81). On August 25, 2003, (10 months later) Plaintiff presented to Dr. Naum with complaints of leg cramps at night, which she had experienced for only two months. Dr. Naum noted Plaintiff was experiencing a "[v]ery difficult domestic situation at present." She was not taking her prescribed medication; she was taking only over-the-counter Advil and Tylenol instead. That is the last time Plaintiff saw Dr. Naum until March 2007, 3 ½ years later, and nine months after her date last insured. The record clearly shows Dr. Naum did not see Plaintiff in the nearly three years prior to her date last insured and for 9 months after her date last insured.

On March 29, 2007, her first visit with Dr. Naum III, her previous doctor, she reported that her medications were working ok, although her pain was still at a level 7 out of 10. She also reported, however, she "ha[d]n't taken pain meds very often." The doctor had a "long talk" with

her "about staying ahead of fibro pain." Her Lexapro, Ultram, Lunesta, and Fioricet were refilled (R. 467).

On April 26, 2007, Plaintiff reported that "meds help[ed] with" headaches "most of the time" and Lunesta "help[ed] with sleep." Plaintiff reported left hip pain that "may travel to some other joint." Upon examination, Plaintiff had "mild discomfort" with range of motion testing of her left knee (R. 464, 505). Her prescriptions were refilled (R. 467, 475, 505).

On June 6, 2007, almost one year after her Date Last Insured, Plaintiff presented to Dr. Naum with complaints of wrist pain. She described this pain at a level six (6). She reported "some retrograde amnesia" with Lunesta, and was told to make sure she was getting 7-8 hours of sleep on this medication. Her examination was normal. Her condition was listed as "stable" (R. 463, 486).

On January 24, 2008, Dr. Naum wrote that Plaintiff had "tried to overcome her physical and mental disabilities" in order to work, but "no matter how sedentary or menial, she has been unable to do so." There is no evidence whatsoever in the record supporting this statement. In fact, Plaintiff testified that she had not even looked for any type of work since she stopped working at the hospital in 2000 (R. 63). Dr. Naum also wrote the previously-discussed statement regarding Plaintiff's use of only mild analgesics and her rejection of higher potency medications in order to meet the needs of her children.

Although Dr. Naum wrote that Plaintiff's pain was between 6 and 8 at her visits ( with only "relatively mild analgesics"), he also pointed out her "recent" automobile accident which caused whiplash, "further exacerbating her pain." He noted the "exacerbation" could last for months to a year or longer. Any exacerbation after Plaintiff's DLI of July 2006, such as this accident, cannot be considered, however.

On June 15, 2009, Dr. Naum completed a "Narrative Report on Karen Pennington," noting that Plaintiff was "depressed, anxious and had trouble adjusting to changes in her life." Plaintiff was "fraught with appetite disturbances and weight change, sleep disturbances, emotional lability, anhedonia, occas. suicidal ideation, social withdrawal, blunt affect and decreased energy. In light of these symptoms as well as her fibromyalgia, gainful employment has been unrealistic." Dr. Naum wrote that "treatment [was] very difficult" because Plaintiff could not tolerate "many medications." Additionally, "[t]reatment of [Plaintiff's] fibromyalgia ha[d] not lead (sic) to very promising results mainly due to intolerance of medication and inability to exercise." Dr. Naum wrote Plaintiff could not get out of bed on "many days." Plaintiff's complaints included symptoms of "diffuse myalgia, hyperesthesia and allodynia, hallmarks of fibromyalgia." Plaintiff's ability to exercise was affected by insomnia and lethargy. Dr. Naum wrote Plaintiff did not tolerate Savella, a medication for fibromyalgia. Dr. Naum opined that Plaintiff was completely and totally disabled (R. 521-22).

Dr. Naum opined Plaintiff had been disabled "at least prior to 2005" (R. 458). Plaintiff correctly cites Wilkins v. Sec., 953 F.2d 93 (4th Cir. 1991) for the proposition that a treating physician may properly offer a retrospective opinion on the past extent of an impairment. The Court in Wilkins held:

> An ALJ may not reject a treating physician's opinion, based on medical expertise, concerning the extent of past impairment in the absence of persuasive contrary evidence.

Id. (Emphasis added). The Court continued:

> The Secretary failed to offer expert or medical evidence that can be viewed as contradicting Dr. Liu's opinion that Wilkins was disabled prior to December 31, 1986. Because the record contains this uncontradicted evidence from Wilkins' treating physician, we conclude that the ALJ's finding that Wilkins' disability did not begin until March 28, 1987 is not supported by substantial evidence.

Id. (Emphasis added).

In Plaintiff's case, the ALJ had before him medical evidence that contradicted Dr. Naum's opinion that Plaintiff was disabled since at least 2005. He had Dr. Sella's examination conducted very near the time of Plaintiff's date last insured in 2006. Notably, Dr. Sella did not even find the 11 tender points required for diagnosis of fibromyalgia. Plaintiff was able to ambulate and get on and off the examining table without difficulty. She was able to heel-toe and tandem walk and squat and rise without major difficulties. Dr. Sella, an examining physician, opined Plaintiff could sit, and could stand, walk, lift and carry light weights, and handle objects occasionally. Significantly, at the time Plaintiff was taking no prescription medications. The undersigned finds Plaintiff's argument that "Dr. Naum's opinions are also uncontradicted by other substantial evidence in the record" is without support.

Dr. Naum's opinions are also unsupported by his own records. The undersigned could find no report of Plaintiff being advised to exercise or of the doctor finding she was unable to do so due to "insomnia and lethargy." Similarly, regarding the opined "intolerance" to "many medications," it is notable that the medications Lexapro, Ultram, Lunesta, and Fioricet, remained the same (and were prescribed by Dr. Naum) from March 29, 2007, the first date she began seeing him after her DLI, through August, 2008. He expressly noted in the 2008 report that he had not tried any other medications to lessen side effects. In fact, on February 11, 2009, Plaintiff reported no side effects from her medications. She specifically denied any "cognitive impairment or other side effect that would interfere with safe operation of a motor vehicle or her activities of daily living." Dr. Naum did report she could not tolerate Savella, but this was not prescribed until years after her DLI. Upon examination in February 2009, Dr. Naum noted that "[t]en systems reviewed . . . all of which were

negative except noted in subjective findings." Plaintiff was alert, times three (3); she was in no acute distress; her gait was normal; she had minimal difficulty rising from the seated position; she ambulated without difficulty; she had pain with flexion and extension of her head; she had pain with flexion and extension of her neck; she was tender to palpation diffusely throughout her bilateral trapezius muscles; she had no trapezius spasm; she had pain throughout her lower spine region; she had no spasm. Dr. Naum noted that the "[r]emainder of Musculoskeletal and Neurologic are unchanged from previous." Plaintiff's judgment, orientation, memory, abstraction, and calculation were grossly normal. Dr. Naum diagnosed fibromyalgia, chronic generalized myofascial pain, anxiety, depression, insomnia, and chronic headaches. He had a "long discussion" with Plaintiff regarding her current medications and its apparent shortcoming. He discontinued her prescriptions for Lexapro, Fioricet, and Ambien. He recommended she try Neurontin and re-prescribed Lunesta (R. 475, 477).

The undersigned finds substantial evidence supports the ALJ's rejection of Dr. Naum's opinions of January 2008 and June 2009, especially insofar as Plaintiff's symptoms and ability to function as of her date last insured in 2006.

Regarding Plaintiff's mental impairments, Plaintiff argues that the ALJ erred by stating that Ms. Coville's opinions were well-supported by the record, while rejecting Dr Naum's opinion because it was rendered after the date last insured. Regarding Dr. Naum, Plaintiff argues that Dr. Naum "specifically states that the limitations described in his report were present for the previous 10 years (R. 530) during the entire period when he treated Plaintiff. Plaintiff cites Wilkins v. Sec., 953 F.2d 93 (4th Cir. 1991) for the proposition that "a treating physician may properly offer a retrospective opinion on the past extent of an impairment." Again, the ALJ had the benefit of

contradictory medical evidence regarding Plaintiff's mental impairments as of her date last insured.

In June 2006, psychologist Coville's mental status examination showed the following: Plaintiff's speech was relevant and coherent; she was oriented, times four (4); her mood was depressed and anxious; her affect was consistent with her mood; her concentration, thought process and content, perception, insight, judgment, immediate and remote memories, persistence and pace were within normal limits; her recent memory was moderately deficient; her psychomotor activity was mildly elevated; she had no suicidal or homicidal ideations; and her social functioning was within normal limits (R. 429).

On June 15, 2009, three years after Plaintiff's DLI, Dr. Naum completed a Psychiatric/Psychological Impairment Questionnaire of Plaintiff. He assessed Plaintiff's GAF was fifty-five (55)(moderate symptoms).[6] He reported she was diagnosed with major depression, anxiety, fibromyalgia, and adjustment disorder. He listed the following findings to support his diagnoses: poor memory, appetite disturbance, sleep disturbance, mood disturbance, emotional lability, loss of intellectual ability of 15 IQ points or more, recurrent panic attacks, anhedonia, feelings of guilt/worthlessness, difficulty thinking and concentrating, suicidal ideations or attempts, social withdrawal, inappropriate affect, decreased energy, obsessions or compulsion, and generalized persistent anxiety. Dr. Naum listed the following as Plaintiff's primary symptoms: poor memory, appetite disturbance, sleep disturbance, mood disturbance, emotional lability, loss of intellectual ability of fifteen (15) IQ points or more. Dr. Naum listed the following as Plaintiff's frequent and/or

---

[6]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

severe symptoms: poor memory, appetite disturbance, sleep disturbance, emotional lability, anhedonia, feelings of guilt/worthlessness, difficulty thinking and concentrating, suicidal ideations or attempts, social withdrawal, inappropriate affect, and decreased energy. Dr. Naum wrote that Plaintiff would require intermittent hospitalization and emergency room treatment due to her symptoms. Dr. Naum made the following findings as to Plaintiff's mental activities: she was markedly limited in her ability to remember locations and work-like procedures, to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods of time, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerance, to sustain ordinary routine without supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, to travel to unfamiliar places or use public transportation, and to set realistic goals or make plans independently. Dr. Naum found Plaintiff was moderately limited in ability to understand and remember one or two step instructions, to carry out simple one or two step instructions, to make simple work-related decisions, to interact appropriately with the general public, to ask simple questions or request assistance, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and to be aware of normal hazards and take appropriate precautions (R. 526-28). Dr. Naum found Plaintiff experienced episodes of decompensation or deterioration in work or work-like settings that caused Plaintiff to withdraw from

a situation or experience exacerbation or her symptoms. Dr. Naum wrote that "[a]ny kind of perceived stress by [Plaintiff] [made] focus and concentration on task impossible." Dr. Naum noted Plaintiff was moderately limited in her ability to perform basic work related activities. Dr. Naum listed the following medications and their side effects: Fioricet caused lethargy and sleepiness; Neurontin caused lethargy, headaches, and confusion; Mobic caused heartburn and abdominal pain; Lexapro caused occasional lethargy; Ambien caused excessive sleepiness following day and occasional hallucinations (R. 528). Dr. Naum found Plaintiff's psychiatric conditions exacerbated her pain. Dr. Naum opined Plaintiff had a low IQ or reduced intellectual functioning. He noted Plaintiff had a high school education, "but was not a good student; has trouble understanding and conceptualizing basic questions & instructions." Dr. Naum found Plaintiff was incapable of "even 'low stress'" jobs; he based this conclusion on his "[p]ersistent observation of attempts at gainful employment." According to Dr. Naum, Plaintiff would have good and bad days (R. 529). Plaintiff would be absent from work more than three (3) times per month due to her impairment (R. 530).

The ALJ's rejection of Dr. Naum's psychiatric evaluation is supported by substantial evidence. First, Dr. Naum is not a psychiatrist or psychologist. Second, there is no diagnosis in the record of adjustment disorder. Third, there is absolutely no support in the record for a finding that Plaintiff had a low IQ and, worse, that she had a loss of intellectual ability of fifteen (15) IQ points or more. A review of the record does not even show an IQ test. There is no support in the record for Dr. Naum's opinion based on his "persistent observation of [Plaintiff's] attempts at gainful employment." Plaintiff herself testified she had not even looked for a job or sought training in the nine years since she quit working at the hospital and took out her "pension." There is no support for a finding that due to mental impairments Plaintiff experienced episodes of decompensation in a work

44

or work-like setting that caused her to withdraw from a situation or experience exacerbation of her symptoms. There are no reports of persistent panic attacks. There is no support for his finding that due to mental symptoms Plaintiff would require intermittent hospitalization and emergency room treatment. There is no support for his finding that Plaintiff had a high school education, "but was not a good student; has trouble understanding and conceptualizing basic questions & instructions." Plaintiff told Ms. Coville she was an average student in regular education, who participated in chorus and was on the yearbook staff. She took college courses to become a registered nurse, but testified that she quit because she "thought [she] had too much like pressure, just trying to work full time and go to school and take care of three children and a house." (R. 60).

Additionally, Dr. Naum's findings on the questionnaire are not supported by his own office notes. On February 11, 2009, the last visit prior to his completion of the questionnaire, Dr. Naum examined Plaintiff. Plaintiff reported no side effects to her medications, except that they were "less than effective at pain control." Plaintiff specifically denied any "cognitive impairment or other side effect that would interfere with safe operation of a motor vehicle or her activities of daily living." Plaintiff was fully alert, was in no acute distress, and her judgment, orientation, memory, abstraction, and calculation were grossly normal.

The undersigned finds substantial evidence supports the ALJ's rejection of Dr. Naum's opinion regarding Plaintiff's mental impairments and their effect on her ability to function, and his crediting Ms. Coville's opinion.

## E. Credibility

Plaintiff next argues that the ALJ failed to properly evaluate her credibility. Defendant contends the ALJ properly evaluated Plaintiff's credibility. Specifically, Plaintiff disagrees with the

ALJ's determination that she was not credible based on the fact that she had not received treatment between 2003 and 2007, had not ever seen a specialist, and that she was able to care for her children, go out to eat, and do some household chores. Plaintiff argues that the fact she did not receive any treatment for a period of time between 2003 and 2007 "cannot be held against her because of her inability to afford treatment." Further, Dr. Naum is a specialist in both pain management and treatment of fibromyalgia. Finally, her ability to engage "in some minimal daily activities fails to show that she can perform sustained work activities."

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The undersigned has already discussed Plaintiff's failure to seek treatment for 3 ½ years at the outset of this discussion, and has already found that substantial evidence supports the ALJ's finding that Plaintiff's failure to seek any treatment of her symptoms for 3 ½ years (3 years prior to and 8 months after her date last insured) adversely affects her credibility regarding her pain and limitations.

Regarding the ALJ's statement regarding Plaintiff's failure to seek treatment from a specialist, Dr. Naum communicated in his letter of January 2008, that he is "an expert on this subject because I am certified in pain medicine and an expert in the treatment of fibromyalgia" (R. 454). Dr. Naum does sit on the Medical Advisory Board of the National Fibromyalgia Association. On the other hand, Dr. Naum himself specifically referred Plaintiff to Dr. Pelligrino, "one of the nation's leading experts on fibromyalgia," on May 2, 2002. Appointments were made first for June 13, 2002,

46

then September 6, 2002, however, there is no record of her ever seeing Dr. Pellegrino, even after she regained her insurance. Plaintiff also never saw a mental health practitioner after her alleged onset date. She testified that her insurance would pay for treatment by a psychologist or psychiatrist, but she "did not know any."

Regarding the ALJ's statement regarding Plaintiff's ability to care for her children, the undersigned notes once again the letter from Dr. Naum stating that Plaintiff would take only relatively mild analgesics "which often do not do the job [because] she has children and is very concerned about meeting their needs, which she feels would be interfered with by higher potency medications . . . ."

Plaintiff testified in 2009, that was that she had stopped going to the grocery store in about 2000 or 2001. She did shop for limited things like milk and bread or ice cream, at a convenience-type store, but only every four to six weeks or so. She said her husband did most of the shopping, and she did not go with him because she had a difficult time going all the way through the store and up and down all the aisles. Plaintiff told Dr. Sella in 2006, however, that she grocery shopped, mostly with her husband, but sometimes with her children. At the first hearing in 2008, Plaintiff testified that at the time of her date last insured (2006), she would go grocery shopping, typically at Kroger's (R. 131). She mostly went with her husband, but sometimes with her children.

It is important to note that the ALJ did not reject Plaintiff's complaints of pain and limitation. He found she had the medically-determinable impairments of fibromyalgia, chronic fatigue, and depression. He also found those impairments to be severe. Her residual functional capacity was strikingly limited for a person of Plaintiff's age. The ALJ limited her to sedentary jobs with sitting limited to six hours in an eight-hour workday, but for no more than 30 minutes at a time. He limited

her to standing and walking only two hours in an eight-hour workday, but further limited to no more than 15 minutes at a time. He limited her to simple, routine, one to three- step tasks not involving high production rates such as in assembly line work or high sales quotas such as telemarketing work.

The ALJ's observations concerning credibility are to be given great weight. <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir.1984). The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff's statements concerning her pain and limitations were not entirely credible for the time period July 1, 2002, through June 30, 2006.

For all the above reasons, the undersigned United States Magistrate Judge finds substantial evidence supports the ALJ's determination that Plaintiff was not disabled through June 30, 2006, her date last insured.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED**, the Plaintiff's Motion for Summary Judgment be **DENIED**, and this case be dismissed from the Court's active docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984),

cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _____ day of February, 2012.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE