IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KAREN LYNN PENNINGTON,

      Plaintiff,

v.                     CIVIL ACTION NO. 1:11CV78
                                (Judge Keeley)

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

      Pursuant to 28 U.S.C. §636(b)(1)(B), Fed. R. Civ. P. 72(b), and L.R. Civ. P. 4.01(d), on May 18, 2011, the Court referred this Social Security action to United States Magistrate John S. Kaull with directions to submit proposed findings of fact and a recommendation for disposition.

      On February 8, 2012, Magistrate Judge Kaull filed his Report and Recommendation ("R&R") and directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Rule 6(e), Fed. R. Civ. P., to file any written objections with the Clerk of Court within fourteen (14) days after receipt of the R&R. On February 22, 2012, Karen Lynn Pennington, by counsel, filed objections to the  R&R.

## I.  PROCEDURAL BACKGROUND

      On April 4, 2006, Karen Lynn Pennington ("Pennington) filed an application for Disability Insurance Benefits ("DIB"), alleging disability since July 1, 2002, due to fibromyalgia and chronic

fatigue (R. 268, 274, 309). Following the Commissioner's denial of her application initially on June 30, 2006 (R. 153) and on reconsideration on November 9, 2006 (R. 154), Pennington requested a hearing. On May 13, 2008, an Administrative Law Judge ("ALJ") conducted a hearing (R. 104-52) at which Pennington appeared, by counsel, and testified. An impartial Vocational Expert ("VE") also testified. On September 23, 2008, the ALJ determined that Pennington was not disabled because she retained the ability to perform light work (R. 158-68).

After Pennington appealed the ALJ's decision, the Appeals Council, on March 20, 2009, determined that the ALJ had failed to adequately  evaluate the treating and examining source opinions. Consequently, it remanded the matter to the ALJ with instructions to "[g]ive further consideration to the treating and nontreating source opinions pursuant to the provisions of 20 CFR 404.1527 and Social Security Ruling 96-2p and 96-5p and explain the weight given to such opinion evidence. . . ." (R. 170-71). On June 16, 2009, an ALJ conducted a second hearing, at which Pennington, represented by counsel, appeared and testified, as did an impartial VE (R. 48-99).

On October 28, 2009, the ALJ determined that Pennington retained the ability to perform work at the sedentary level, and

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

that work was available in the national and local economies that she could perform (R. 26-43). The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner (R. 4-8). On May 18, 2011, Pennington timely filed this action seeking review of that final decision.

## II.  PLAINTIFF'S BACKGROUND

At the time of her application, Pennington was 33 years old. At the time of the second administrative hearing, she was 36 years old (R. 54, 268). She has a high school education and relevant employment history as a nurse assistant (R. 59, 310).

## III.  ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.  Pennington last met the insured status requirements of the Social Security Act on June 30, 2006 (R. 28);

2.  Pennington did not engage in substantial gainful activity during the period from her alleged onset date of July 1, 2002 through her date last insured of June 30, 2006 (20 CFR 404.1571 *et seq*.) (R. 28);

3.  Pennington had the following severe impairments through her date last insured: fibromyalgia, chronic fatigue, and depression (20 CFR 404.1520(c)( (R. 28);

4.  Pennington did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (R. 36) through her date last insured;

5.  Pennington retained the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(b) through her date last insured with the following restrictions she: is limited to sitting for six hours in an eight hour workday with no more than 30 minutes at one time; can stand and walk for two hours in an eight hour workday with no more than 15 minutes at a time; and is limited to performing simple routine one to three step tasks that do not involve high production rates such as assembly line work or high sales quotas such as in telemarketing work (R. 38);

6.  Pennington is unable to perform any past relevant work through her date last insured (20 CFR 404.1565) (R. 41);

7.  Pennington was 33 years old on the date last insured , which is defined as a younger individual age 18-49, (20 CFR 404.1563) (R. 42);

8.  Pennington has at least a high school education and is able to communicate in English (20 CFR 404.1564) (R. 42);

9.  Pennington is "not disabled," whether or not she has transferable job skills, because the Medical-Vocational Rules used as a framework supports the finding that transferability of job skills is not material to the determination regarding disability (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 42);

10. Based on Pennington's age, education, work experience, and residual functional capacity, there are jobs in significant numbers in the national economy that she could have performed through her date last insured (20 CFR 404.1569 and 404.1569(a)) (R. 42); and

11.  Pennington was not under a disability, as defined in the Social Security Act, at any time from July 1, 2002, the alleged onset date, through June 30, 2006, the date last insured (20 CFR 404.1520(g)) (R. 43).

### IV.  <u>PLAINTIFF'S OBJECTIONS</u>

In her objections to the R&R, Pennington contends that the ALJ 1) did not properly weigh the medical opinion evidence submitted by her treating physician, George P. Naum, III, DO, and examining physician, Dr. Sella, and 2) did not properly evaluate her credibility. (Pl's. Objs. p. 2).

### V.  <u>DATE LAST INSURED</u>

As a threshold matter, the magistrate judge correctly noted that  Pennington's date last insured ("DLI") was June 30, 2006, and that, due to the June 20, 2002 unfavorable agency decision (R&R 26), the relevant time frame related to her claim is June 2002 through June 30, 2006 (R&R p. 26).

In <u>Johnson v. Barnhart</u>, 434 F.3d 650 (4th Cir. 2005), the Fourth Circuit held that, to qualify for DIB, a claimant "must prove that she became disabled prior to the expiration of her insured status. 42 U.S.C.A. § 423(a)(1)(A), (c)(1)(C); 20 C.F.R. §§ 404.101(a), 404.131(a)(2005)." <u>Id.</u> at 656. Pursuant to the holding in <u>Johnson</u>, therefore, Pennington must establish a disability on

or before her DLI of June 30, 2006, and also must prove that it has existed continuously from her DLI.

## VI. MEDICAL RECORDS

### A. JUNE 2002 THROUGH JUNE 30, 2006

The medical records relevant to the time frame June, 2002 through June 30, 2006 include:

1.   A July 15, 2002 office note from George P. ("Jeep") Naum, III, D.O., ("Dr. Naum"), Pennington's treating physician, indicating that Pennington's fibromyalgia symptoms were "fairly stable at this time" (R. 382);

2.   A September 20, 2002 office note from Dr. Naum, indicating a normal examination and noting that Pennington's "[f]ibro appear[ed] to be somewhat stable on exam today and that she was "managing her medications very well" (R. 381);

3.   An October 31, 2002 office note from Dr. Naum, indicating Pennington reported feeling "a lot  better" (R. 380) with the combination of  Effexor and Provigil, and noting that she had reported Phrenilin "no longer help[ed] her headaches." Examination revealed stable vital signs, a regular heart rate and rhythm, and clear lungs. Dr. Naum recommended that she take Advil Cold and Sinus rather than sudafed/acetominophen medication. He also noted

that she was "[h]aving a better day as far as pain and had curled her hair and put on makeup, which [was] a big step for her." He diagnosed "[s]ome improvement in fibromyalgia" and directed her to follow up after her "appointment with Dr. Pellagreeno"[1] [sic] (R. 380-81);

4. An August 25, 2003 office note from Dr. Naum indicating Pennington had complained of leg cramps at night for the past two months and a "[v]ery difficult domestic situation at present." He noted Pennington was not taking her prescribed medications and was taking only over-the-counter Advil and Tylenol. He diagnosed fibromyalgia, depression and hypothyroidism, and directed her to follow up when she was able (R. 379);

5. A June 16, 2006 report from Holly Coville, M.A., Ed.S. ("Ms. Coville"), a psychologist, prepared for the West Virginia Disability Determination Service indicating Pennington reported a diagnosis of fibromyalgia, chronic fatigue syndrome and depression, and noting that Pennnington took only over-the-counter medications due to the lack of health insurance to pay for prescription drugs

---

[1]     Review of the record reflects that Pennington failed to go to the scheduled appointments with Dr. Pellegrino (R. 380-81). In fact, there are no reports or notes from Dr. Pellegrino in the record.

(R. 428). A mental status examination revealed relevant and coherent speech, orientation to time, place, person and circumstance, a depressed and anxious mood, an affect consistent with her mood, concentration, thought process and content, perception, insight, judgment, immediate and remote memories, persistence and pace all within normal limits, a moderately deficient recent memory, mildly elevated psychomotor activity, no suicidal or homicidal ideations, and social functioning within normal limit (R. 429).

Pennington listed her daily activities as completing miscellaneous things around her home, watching television, not cooking as often as she used to, caring for her children, going out to eat once a week "if she [felt] good enough," and doing some grocery shopping. She stated that she could not mop or scrub the floors or the bathtub, sometimes needed assistance bathing, and that her husband did "most of the activities around" the home (R. 429).

Ms. Coville diagnosed Axis I major depressive disorder, recurrent, moderate, Axis II no diagnosis, and Axis III fibromylgia, chronic fatigue syndrome (as reported by claimant). As her diagnostic rationale, Ms. Coville indicated:

> Ms. Pennington is reporting multiple symptoms
> of depression, including sleep disruption,
> crying, decreased energy, depressed
> worthlessness, guilt, impaired attention and
> concentration, social withdrawal and
> anhedonia. Ms. Pennington feels that these
> symptoms have been present since the onset of
> her pain about six years ago.

Ms. Coville determined that Pennington's prognosis regarding her mental health was fair and that she could manage benefits (R. 427-9);

6.   A June 26, 2006 report from a West Virginia Disability Determination Service examination performed by Gabriel Sella, M.D. ("Dr. Sella"), indicating Pennington reported having fibromyalgia, chronic fatigue, anxiety, and depression. The examination revealed Pennington walked without difficulty, got on and off the examination table without difficulty, "performed the tandem, Rhomberg, heel walking, tiptoe walking, as well as squatting without any major problems," had normal judgment and insight, had good recent and remote memories, and was oriented times three (3). Dr. Sella tested the eighteen (18) trigger points commonly used to define fibromyalgia and noted that Pennington had negative findings. Joint testing and neuromuscular testing established only "two trigger points in the gluteus major area, and a generally

tender back, but no trigger points." The neurological examination revealed "[p]ossible minimal motor decrease" and mildly depressed mentation. Dr. Sella noted that Pennington took only over-the-counter Tylenol and Advil.

Dr. Sella determined that

> In terms of work-related abilities, she can sit, she can stand occasionally, walk occasionally, and lift and carry light weights occasionally, handle objects occasionally, and speak, hear, and travel. It is clear that she needs further investigation and diagnosis as well as appropriate treatment for her condition.
>
> CONCLUSIONS: This is a pleasant, 33 year old lady, with a diagnosis of fibromyalgia and related symptoms. She can perform the work-related functions described above.

(R. 420-3).

7.    A June 29, 2006 Psychiatric Review Technique report from G. David Allen, Ph.D., indicating Pennington had an affective disorder characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbances, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide (R. 434). He determined that she had mild limitations in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration,

persistence, and pace, and had not experienced any episodes of decompensation of extended duration. Dr. Allen stated that Pennington was credible, was not currently taking medication for depression, and that her dysfunction appeared "to derive from pain rather than depression" (R. 443); and

8.   A June 30, 2006 Physical Residual Functional Capacity Assessment from Guy Kemp, a medical consultant, and affirmed by Jim Capage, Ph.D, and James Binder, M.D., indicating Pennington had no exertional, postural, manipulative, visual, communicative, or environmental limitations. He noted:

> Claimant indicates functional restrictions due to fibromyalgia and chronic fatigue. She is not medicated for any condition, and current physical findings are all normal. Gait is normal, and there are no reflex or sensory deficits. She appears capable of performing all activities necessary of daily living. Comparison of submitted daily activities/pain questionnaire show that the climant[sic] is at least partially credible. However, owing to the lack of significant physical findings, an RFC of Non-Severe is appropriate.

(R. 445-52).

**B.   MEDICAL RECORDS SUBMITTED AFTER THE RELEVANT TIME FRAME**

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

1.    A February 9, 2007 office note from George Naum, M.D. ("Dr. G. Naum"),[2] indicating that Pennington had been unable to see a doctor "due to no insurance." He noted that she rated her pain at seven (7) on a scale of one-to-ten (1-10) (R. 466, 488), was taking only over-the-counter medications, and that her trigger points "seem[ed] to be authentic." He noted, however, this was not his field of expertise. He prescribed an antidepressant, sleep aid, and pain medication, and advised her to follow-up with his son, "Jeep" Naum, her previous treating physician (R. 467);

2.    A March 29, 2007 office note from Dr. Naum, indicting Pennington rated her pain level as seven with her medications but further reported that she did not take her medications very often. Dr. Naum discussed with her the importance of "staying ahead of fibro pain" and refilled her Lexapro, Ultram, Lunesta, and Fioricet (R. 465);

3.    An April 26, 2007 office note from Dr. Naum, indicating Pennington reported that her "meds help[ed] with" headaches "most of the time" and Lunesta "help[ed] with sleep." She reported left hip pain that "may travel to some other joint." The examination,

---

[2]    This office note relates to an examination eight months after Pennington's DLI, June 30, 2006, and three and a half years after her last appointment with her treating physician, Dr. Naum.

revealed "mild discomfort" with range of motion testing of her left knee (R. 464, 505). He refilled all of her prescriptions except Fiorcet (R. 467, 475, 505);

4.     A June 6, 2007 office note from Dr. Naum, indicating Pennington complained of wrist pain which she described as level six (6), and "some retrograde amnesia" with Lunesta. He instructed her to get seven to eight hours of sleep while on this medication. The examination revealed normal general appearance, respiration, heart palpation and auscultation (R. 463, 486);

5.     An October 3, 2007 office note from Dr. Naum, indicating Pennington stated her medications were not working as well as before.   He   diagnosed   fibromyalgia,   chronic   generalized musculoskeletal   pain,   anxiety,   depression   and   insomnia   and increased her dosage of Ultram (R. 594;

6.     A January 3, 2008 office note from Dr. Naum, indicating Pennington rated her pain as five on a scale of one to ten, and complained of neck, mid-back and shoulder pain due to a recent automobile accident (R. 483;

7.     A January 24, 2008 letter from Dr. Naum, indicating that, during the several years he had treated Pennington, even though she tried to overcome her physical and mental disabilities and return

to work, she had been unable to return to even sedentary or menial jobs. He also noted that she had tried to control her pain with relatively mild analgesics. He opined that Pennington had been disabled since at least prior to 2005 and that she should receive full, total disability benefits (R. 457-58);

8. A February 13, 2008 reevaluation from Dr. Naum, indicating Pennington rated her pain as six to seven on a scale of one to ten and reported none of her pain medications were helping her pain. However, no medication changes were noted (R. 459);

9. A May 9, 2008 Fibromyalgia Impairment Questionnaire completed by Dr. Naum, indicating

> that he had last treated the claimant (Pennington) on April 18, 2008, and that she had been diagnosed with fibromyalgia, depression, insomnia, and chronic daily headaches. Her prognosis was considered fair to poor. Dr. Naum stated that positive clinical findings, included diffuse pain; fleeting, moving, multiple tender points; pain most notably at the neck and shoulder area; cognitively challenged on questioning; and slow speech. He noted that on many visits the claimant's lethargy appeared to be incapacitating. He stated that she had periarticular spasm in multiple areas including the shoulders, hips and knees, as well as notable allodynia of the neck, shoulders, arms, low back and both lower extremities. Dr. Naum stated that the claimant had been ruled out for other rheumatic

disorders and x-rays and a full joint survey had shown no arthritis. The claimant's primary symptoms included insomnia, incapacitating fatigue and pain in multiple areas all consistent with fibromyalgia. Dr. Naum indicated that the claimant's impairments and functional limitations were reasonably consistent with the physical and emotional impairments described. He stated that the claimant had pain in all body areas, and that the pain occurred on a daily basis, although the duration and frequency varied from day to day. Dr. Naum rated the claimant's pain as moderately severe. He noted that her medications caused weight gain, sedation, fatigue, ineffectiveness, excessive sleepiness, and worsening of cognitive function. He opined that the claimant's impairments had lasted or could be expected to last for at least 12 months, and that she was not a malingerer.

Dr. Naum opined that the claimant could sit for no more than one hour in an eight hour day and stand and walk for no more than one hour in an eight hour day. He stated that she should not sit continuously in a work setting, but should get up and move around every 15 minutes and do this for 30 to 45 minutes before sitting again. Dr. Naum further opined that the claimant should not stand and walk continuously in a work setting. He found that the claimant could lift and carry no more than five pounds occasionally. He sated that she was incapable of even low stress jobs. Dr. Naum indicated that his medical opinion was based upon the claimant's symptoms and her explanation thereof. He stated that emotional factors contributed to the severity of the claimant's symptoms and functional limitations, noting that depression and

anxiety due to the limitations presented by the fibromyalgia increased the claimant's stress, which worsened her symptoms. He opined that she would frequently need to take unscheduled breaks of at least 30 minutes during an eight hour workday. Dr. Naum stated that the claimant's impairments were likely to produce good days and bad days, and he opined that she would likely have to be absent from work more than three times per month due to her impairments or treatment. He further opined that the claimant would need to avoid wetness, humidity, and temperature extremes, and that she should not perform pushing or pulling, kneeling, bending or stooping. Dr. Naum state that these limitations had applied since 2000, and he opined that the claimant was not capable of any gainful employment now or in the future.

(R. 468-73);

10. A May 26, 2009 report[3] from Dr. Sella, indicating Pennington reported having fibromyalgia, chronic fatigue, anxiety and depression. Dr. Sella noted that Pennington took only over the counter medications like Tylenol and Advil (R.420). The examination revealed a range of motion with a number of non-physiological responses. Pennington was able to walk in and out of the examining room without difficulty or use of a cane, got on and off the examination table without difficulty, performed the tandem,

---

[3]  The magistrate judge noted that Dr. Sella completed this report almost three years after Pennington's DLI (R&R p. 36).

Romberg, heel walking, tiptoe walking, and squatting without any major problems (R. 421).

Dr. Sella reported:

> Discussion of the four complaints really refer to fibromyalgia symptoms. She was diagnosed by an unknown physician with possible fibromyalgia in the year 2000. The diagnosis was carried to her new physician in the same year, who basically stated that she came to him already with that diagnosis. She was tried by him on various medications with no particularly good results. She continues to complain of generalized pain and fatigue as well as anxiety and depression. The four should be taken together as pertaining to the same syndrome. She is no longer working outside the house. She has three children, and the children, as well as the husband help her around as much as they can. She is a bright lady, who stated that she would like to go back to work.
>
> At the present time, the examinee is not taking any medication and does not do any physicial or occupational therapy. She has not learned any new profession in the six years that she has had this condition.
>
> In terms of work-related abilities, she can sit, she can stand occasionally, walk occasionally, and lift and carry light weights occasionally, handle objects occasionally, and speak, hear, and travel. It is clear that she needs further investigation and diagnosis as well as appropriate treatment for her condition.

(R. 420-22); and

11.  An October 19, 2010 letter from Dr. Naum, indicating:

. . . Mrs. Pennington came to see me initially
on 05/01/2000 and she had been diagnosed with
fibromyalgia according to her intake sheet by
a previous physician. She stated that she had
fibromyalgia for 2 years. Medications at that
time were episodic use of Tylenol, Advil,
Aspirin, Ibuprofen, Flexeril and she had also
been on Paxil. She is a smoker of 1 to 1 ½
packs of cigarettes per day and drinker of
approximately 1 to 1 ½ pots of coffee per day.

Significant past medical history was she was a
Gravida 4, Para 3, with 1 child dying 2 hours
after delivery due to a prenatal birth
infection. I examined her on her first visit
and in doing a complete tender point survey on
Mrs. Pennington it was my feeling that she did
indeed have fibromyalgia. She was tender 18
out of 18 tender points. I started her on
Klonpin 1 mg at bedtime for sleep, Relafex 750
mg t.i.d. and Skelaxin 400 mg b.i.d. for
muscle spasm and for pain. Over the next
several months and years the patient had been
tried on a variety of medication with minimal
success. Currently she is on Fioricet one p.o.
q4h prn migraine headache, which as you may
know is a comorbid condition associated with
fibromyalgia. She currently is on Neurontin
600 mg p.o. t.i.d. for fibromyalgia induced
neuropathic pain, Lunesta 3 mg p.o. q.h.s. for
slepe and Savella 100 mg p.o. b.i.d. for
symptoms specific to her fibromyalgia. Other
comorbid conditions for Mrs. Pennington
include depression and insomnia as well as
extreme lethargy. Since having seen me
initially back in 2000 Mrs. Pennington has
tried to work on a number of different
occasions, specifically in a moving business
that her husband ran and trying to do clerical

work. That, however on numerous occasions was
not something that she was able to do.

To this day she does not sleep well. Every
medication that I mentioned that she is on she
does not take on a regular basis but takes
episodically according to the need.

As to my credentials regarding fibromyalgia, I
have a number of patients in my practice who
suffer from it and I do sit on the Advisory
Board to the National Fibromyalgia Foundation
and have been treating fibromyalgia for
approximately 20 years. There are some
patients who are able to work of some type but
it has been my experience that working the
majority of cases is not something that is
practical and that certainly is the case with
Mrs. Pennington.

Laboratory work has been done on Mrs.
Pennington a number of times over the years to
rule out any rheumatic conditions that could
be confused with her fibromylgia, however,
those laboratory findings are negative towards
any rheumatic diagnosis or collagen vascular
diagnosis.

Her frequency of visits are variable according
to her financial status and her ability to pay
for her visits. Her last visit here in the
office was on 07/21/2010 and her diagnoses
included fibromylgia, chronic generalized
myofascial pain, depression, migraine headache
and insomnia. At that visit she was given
samples of Savella as well as Lunesta.

In regards to her limitations on activities,
the patient is able to do some housework
although very limited because she gets
fatigued very easily. She has to take frequent

> naps due to her lethargy. She is able to do her own activities of daily life such as dressing, bathing, toileting, etc. Housework as I said is extremely limited. She is able to drive for short periods of time but is not able to do any activity rather for pleasure or for work for any extended period of time which has added to her psychological problems.
>
> Her prognosis for recovery is fair at best. Even with current medications that are considered to be state of the art she is still limited as discussed above. It is my opinion that her condition will continue in the distant future exceeding 12 months in duration. It is also not my belief that the patient can do full-time competitive work and is otherwise disabled to any kind of gainful employment.

(R. 532-34).

## VI. __DISCUSSION__

### A. __Scope of Review__

In reviewing an administrative finding of no disability, A district court's scope of review is limited to determining only whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Even prior to Hayes, the Fourth Circuit had recognized that the scope of review was specific and narrow: "We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be

upheld, even if the court disagrees, so long as it is supported by substantial evidence." <u>Smith v. Schweiker</u>, 795 F.2d 343, 345 (4th Cir.1986).

The Supreme Court of the United States has defined substantial evidence as "'such relevant evidence as a reasonable mind might accept to support a conclusion.'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (<u>quoting</u> <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition in <u>Hays</u>, the Fourth Circuit observed that substantial evidence "'consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" 907 F.2d at 1456 (<u>quoting</u> <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). Finally, a reviewing court must also consider whether the ALJ applied the proper standard of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

**B.    <u>Failure to Properly Consider the Medical Opinion Evidence</u>**

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Pennington contends that the ALJ failed to properly consider the evidence from Dr. Naum, her treating physician, regarding her limitations and their effects on her ability to perform any type of work. She further contends that the record does not support the opinion of Dr. Sella, the examining physician, that she retains the ability to perform sedentary work. The Commissioner contends that the ALJ properly considered all the evidence of record, provided an adequate basis for his opinion, and assigned proper weight to the medical evidence.

According to Pennington, the ALJ erred in determining that substantial evidence contradicts the opinion of Dr. Naum that she is unable to perform even sedentary work, and that she had been disabled at least since 2005. In addition, she argues that the ALJ erred in finding that the record contains substantial evidence to support Dr. Sella's RFC finding that she retained the ability to perform sedentary work.

The ALJ determined that the objective signs and findings detailed in the medical records prior to June 30, 2006, including some of Dr. Naum's own office notes, did not support an opinion that Pennington was unable to perform work at any level. In

reaching this conclusion, the ALJ considered a number of medical records from Dr. Naum, including:

1.    A May 1, 2000 office note indicating a normal examination, except that all 18 fibromyalgia tender points were positive and a diagnosis of fibromyalgia by history (R. 28);

2.    A June 2, 2000 office note prescribing Ambien, Darvocet and Effexor for uncontrolled fibromyalgia (R. 28);

3.    A August 11, 2000 office note, indicating Pennington had reported Vicodin was helping the pain "but not as much as she would like and reporting "worsening headaches" (R. 28);"

4.    An October 6, 2000 office note, indicating Pennington had reported considerable pain, a history of physical and emotional abuse, and improvement regarding her migraine headaches due to medication (R. 29);

5.    A February 8, 2001 office note, indicating Pennington's fibromyalgia was still uncontrolled and that she was taking Percocet for pain (R. 29);

6.    A March 15, 2001 office note, indicating Pennington had chronic fatigue, exhaustion and persistent headaches (R. 29);

7.    A April 20, 2001 office note, indicating Pennington's fibromyalgia pain did not appear to be as significant as before (R. 29);

8.    A May 25, 2001 office note, indicating Pennington had reported Percocet was not helping her pain and placing her on Oxycodone (R. 29);

9.    An April 1, 2002 office note, indicating Pennington reported "feeling pretty good" except for the effects of her marital problems (R. 29);

10.   A July 15, 2002 office note from an examination just a few days after her alleged onset date, July 1, 2002, indicating Pennington's fibromyalgia symptoms were "fairly stable at this time" (R. 29).

11.   An October 31, 2002 office note, indicating Pennington was doing better with a combination of Provigil and Effexor (R. 29);

12.   An August 25, 2003 office note, indicating Pennington was "in a very difficult domestic situation, was not taking any of her medications" and a diagnosis of fibromyalgia, depression and hyprothyrodism (R. 29);

13.  A February 9, 2007 office note, indicating Pennington had returned to his care after an absence of several years due to having no insurance and rated her pain as seven on a scale of one to ten.  At this time, he opined that her trigger points seemed to be authentic and recommended use of an antidepressant (R. 30);

14.  A March 29, 2007 office note, indicating Pennington had stated her medications were working okay, her pain was seven on a scale of one to ten and reporting she was not taking her medication very often (R. 30);

15.  An April 26, 2007 report, indicating Pennington had reported her medications helped her headaches most of the time and Lunesta helped her sleep (R. 30);

16.  An October 3, 2007 office note, indicating Pennington had stated her medications were not working as well as before, a diagnosis of fibromyalgia, chronic generalized musculoskeletal pain, anxiety, depression and insomnia, and an increase in her dosage of Ultram (R. 30);

17.  A January 3, 2008 office note, indicating Pennington had rated her pain as five on a scale of one to ten, and was complaining of neck, mid-back and shoulder pain due to an automobile accident (R. 30);

18.  A January 28, 2008 letter, indicating that, during the several years Dr. Naum treated Pennington, she had tried to overcome her physical and mental disabilities and return to work but had been unable to return to even sedentary or menial jobs and had tried to control her pain with relatively mild analgesics. He opined that Pennington had been disabled at least prior to 2005 and that she should receive full, total disability benefits (R. 30-31);

19.  A February 13, 2008 letter, indicating Pennington had rated her pain as six to seven on a scale of one to ten and reported none of her pain medications were helping; however, no medication changes were noted (R. 31); and

20.  A May 9, 2008 Fibromyalgia Impairment Questionnaire, indicating Pennington was unable to sit for more than one hour in an eight hour day, stand and walk for more than one hour in an eight hour day, should not sit continuously in a work setting, should get up and move around every 15 minutes for 30 to 45 minutes before sitting again, should not stand and walk continuously in a work setting, could lift and carry no more than five pounds occasionally, was incapable of performing even low stress jobs, would frequently need to take unscheduled breaks of at least 30 minutes during an eight hour workday, would likely have to be

absent from work more than three times per month, would need to avoid wetness, humidity, and temperature extremes, and could not perform pushing or pulling, kneeling, bending or stooping. He further opined that her depression and anxiety due to the limitations presented by the fibromyalgia increased her stress and worsened her symptoms. Finally, Dr. Naum stated that these limitations had applied since 2000, and therefore Pennington was not capable of any gainful employment now or in the future. (R. 31)

The ALJ specifically noted Dr. Sella's examination of Pennington on June 26, 2006, a date just prior to her DLI (R. 30), during which Pennington walked without difficulty, got on and off the examination table without difficulty, "performed the tandem, Rhomberg, heel walking, tiptoe walking, as well as squatting without any major problems," had normal judgment and insight, had good recent and remote memories, and was oriented times three (3).

Importantly, Dr. Sella tested the eighteen (18) trigger points commonly used to define fibromyalgia and had documented negative findings. Moreover, his joint testing and neuromuscular testing established only "two trigger points in the gluteus major area, and a generally tender back, but no trigger points." The neurological examination revealed "[p]ossible minimal motor decrease" and mildly

depressed mentation. Pennington's medications were noted as only over-the-counter Tylenol and Advil.

Based on his examination, Dr. Sella concluded:

> In terms of work-related abilities, she [Pennington] can sit, she can stand occasionally, walk occasionally, and lift and carry light weights occasionally, handle objects occasionally, and speak, hear, and travel. It is clear that she needs further investigation and diagnosis as well as appropriate treatment for her condition.
>
> CONCLUSIONS: This is a pleasant, 33 year old lady, with a diagnosis of fibromyalgia and related symptoms. She can perform the work-related functions described above.

(R. 420-3).

As the following exchange during the June 16, 2009 hearing documents, the ALJ noted that Dr. Sella had clarified his opinion with regard to the number of hours Pennington could sit, stand and walk in an eight hour day:

ATTY:      . . . Looking at Exhibit 13-F which is Dr. Cella's [sic] report, the consultative examiner, he's got the Claimant limited to a total of sitting for two hours, standing two hours, walking two hours, total in an eight hour day. I'm assuming that's and RRC [sic] for less than full-time work.

VE:        Right, that only covers six hours. So the person would not be capable of doing SGA.

ALJ:       He doesn't say what she does the other part of the time,
           right?

ATTY:      Well, no, really no because there aren't many –

ALJ:       Well, isn't there a place on here for him to do that?
           Doesn't it say, explain what the person is doing if it
           doesn't amount to eight hours?

ATTY:      It does ask that but that's not noted.  Wait a minute.
           Read handwriting –

ALJ:       I thought it was blank. I mean, it would appear that the
           questionnaire wasn't completely filled out in that
           respect, in that it specifically asks them if they don't
           come up with eight hours of standing, walking or sitting,
           to put in anything else the person is doing.

ATTY:      It says here, actually I'm looking on Page 8 and the
           doctor wrote, she may sit for another two hours, so I'm
           not sure where that's coming from, whether – well, all of
           a sudden she can sit for another two hours because they
           didn't ask the question properly, or because I didn't ask
           the question properly.

ALJ:       Well, I think I did ask – when I saw that CE come in, I
           think I told my assistant to go back and ask the doctor
           to fill out, you know, to complete the form because it
           came in not completed.

ATTY:      Right.

ALJ:       And so apparently then he did go back in and put that in.

ATTY:      So then my question of the vocational expert, one of the
           things that this doctor has is about sitting, standing
           and walking for period of time 15 minutes sitting, 20 or
           25 minutes standing, 15 minutes walking without
           interruptions. So with that type of sitting, standing,
           walking statement, which is a little bit more I think
           than was given in the Judge's hypothetical, is that kind

of – I guess let me also state, considering the
limitation of only lifting and carrying up to ten pounds,
which I assumed would place the person at no more than
sedentary; an I correct in that?

A.    Well, depends on the amount of walking. A security guard
lifts less than ten pounds, because they're on their feet
the entire time, they're considered light, but the answer
I used for the hypothetical, you're correct, my answers
would limit us to a sedentary.

The ALJ further noted that, even though Dr. Sella had failed

to define "occasional" and "light weights" in his report,

occasional is generally considered to be one-third of a workday and

light weights are generally considered to be 20 or 10 pounds

occasionally. The ALJ assigned significant weight to Dr. Sella's

report and noted that it "revealed few positive physical findings,

notably it "did not find the requisite positive tender points for

a diagnosis of fibromyalgia," and occurred nearest to Pennington's

DLI (R. 30).

In <u>Sarchet v. Chater</u>, 78 F.3d 305, 306-07, (7th Cir. 1996), the

Seventh Circuit discussed fibromyalgia's symptoms as follows:

. . . fibromyalgia also known as fibrositis –
a common, but elusive and mysterious, disease,
much like chronic fatigue syndrome, with which
it shares a number of features. . . .  Its
cause or causes are unknown, there is no cure,
and, of greatest importance to disability law,
its symptoms are entirely subjective.  There
are no laboratory tests for the presence or

> severity of fibromyaligia. The principal
> symptoms are 'pain all over,' fatigue,
> disturbed sleep, stiffness, and - <u>the only
> symptom that discriminates between it and
> other diseases of a rheumatic character -
> multiple tender spots, more precisely 18 fixed
> locations on the body</u> (<u>and the rule of thumb
> is that the patient must have at least 11 of
> them to be diagnosed as having fibromyaligia</u>)
> that when pressed firmly cause the patient to
> flinch.

(Emphasis added).

Here, after careful consideration of all the medical evidence
of record, the ALJ concluded that Dr. Naum's opinion "[i]s not
fully consistent with the objective medical signs and findings
contained in the medical records for the period prior to June 30,
2006." He specifically found Dr. Naum's opinion inconsistent with
the documented objective findings from the period prior to
Pennington's DLI (R. 32).

The ALJ also determined that Dr. Naum had offered opinions on
issues reserved to the Commissioner, specifically that Pennington's
"case should be investigated further so that she can get what she
qualifies for and that is full, total disability benefits," and
that she had been  disabled "at least prior to 2005" (R. 457-58).

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Based on SSR 96-5p, the ALJ determined that Dr. Naum's opinions could not be assigned controlling weight or special significance.[4]

Pennington relies on <u>Wilkins v. Sec.</u>, 953 F.2d 93 (4th Cir. 1991),to support her argument that Dr. Naum's opinion that she had been disabled since at least prior to 2005 is controlling because there is no contrary evidence. In <u>Wilkins</u>, the Fourth Circuit held that a treating physician may properly offer a retrospective opinion on the past extent of an impairment. <u>Id.</u> at 96.

Unlike the facts in <u>Wilkins</u>, however, the ALJ in this case determined that the record contained substantial evidence

---

[4]    SSR 96-5p 1996 WL 374183 at *5 (S.S.A. July 2, 1996) provides:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is 'disabled' or 'unable to work,' or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, <u>they can never be entitled to controlling weight or given special significance</u>. (Emphasis added.)

contradicting Dr. Naum's opinion regarding the onset of Pennington's disability. Referencing in particular Dr. Sella's June 26, 2006 examination, the ALJ noted that, when Dr. Sella performed the test for the 11 tender points required for a diagnosis of fibromyalgia, the results were negative.

In his careful consideration of this issue, the magistrate judge determined that Pennington's argument lacked support (R&R 40). He noted particularly that Dr. Naum's own records did not support his opinion. The magistrate judge stated he was unable to find any office note or reports from Dr. Naum dated before her DLI that stated Pennington was unable to exercise due to "insomnia and lethargy" (R&R 40). Similarly, even though Dr. Naum had opined that Pennington had an "intolerance" to "many medications," he had consistently prescribed Lexapro, Ultram, Lunesta, and Fioricet, from March 29, 2007, the first date she began seeing him after her DLI, through August, 2008 (R&R 40). Moreover, his 2008 report noted that he had not prescribed other medications to help lessen any side effects. In fact, on February 11, 2009, Pennington reported no side effects from her medications and specifically denied any "cognitive impairment or other side effect that would interfere with safe operation of a motor vehicle or her activities of daily

living" (R. 477). While Dr. Naum did document that Pennington could not tolerate Savella, a drug used to treat fibromyalgia, he prescribed that medication years after her DLI.

When Dr. Naum examined Pennington in February 2009, he noted that "[t]en systems reviewed . . . all of which were negative except noted in subjective findings," no acute distress, normal gait, minimal difficulty rising from the seated position, ambulation without difficulty, pain with flexion and extension of her head, pain with flexion and extension of her neck, tenderness to palpation diffusely throughout her bilateral trapezius muscles, no trapezius spasm, pain throughout her lower spine but no spasm, and that she was alert times three. He noted that the "[r]emainder of Musculoskeletal and Neurologic are unchanged from previous." Pennington's judgment, orientation, memory, abstraction, and calculation were grossly normal.

Dr. Naum diagnosed fibromyalgia, chronic generalized myofascial pain, anxiety, depression, insomnia, and chronic headaches. Following a "long discussion" with Pennington regarding her current medications and their apparent shortcoming, he discontinued Lexapro, Fioricet, and Ambien and recommended trying Neurontin and Lunesta (R. 475, 477).

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

After reviewing all this evidence, the magistrate judge concluded that there was substantial evidence in the record to support the ALJ's decision not to assign controlling weight to Dr. Naum's opinions, and to assign significant weight to the June 26, 2006 report from Dr. Sella (R&R 41). He specifically noted that, in January, 2008 and June, 2009, Dr. Naum had opined that, at least since 2005, Pennington had been disabled and unable to perform work at any level, while on June 26, 2006, Dr. Sella had opined, with regard to work-related activities, that Pennington "could sit, she can stand occasionally, walk occasionally, and lift and carry light weights occasionally, handle objects occasionally, and speak, hear, and travel" (R. 422). The magistrate judge noted that this assessment of Pennington's ability to function by Dr. Sella had occurred just four days prior to Pennington's June 30, 2006 DLI (R&R 41).

## C. Credibility

Turning next to the issue of credibility, Pennington objects to the ALJ's determination that she was not credible based on the fact that she received no treatment between 2003 and 2007, had never seen a specialist, and that she was able to care for her children, go out to eat, and do some household chores (R&R 45). She

asserts that the fact that she did not receive treatment for a period of time between 2003 and 2007 "cannot be held against her because of her inability to afford treatment" (R&R 45). She further contends that Dr. Naum is a specialist in both pain management and treatment of fibromyalgia, and that her ability to engage "in some minimal daily activities fails to show that she can perform sustained work activities" (R&R 45).

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir.1984) (<u>citing</u> <u>Tyler v. Weinberger</u>, 409 F.Supp. 776 (E.D.Va.1976)).

Regarding Pennington's credibility, the ALJ stated:

> In terms of the claimant's alleged fibromyalgia and chronic fatigue symptoms, the undersigned finds that the claimant's allegations are not fully consistent with the objective medical signs and findings set forth in the medical evidence in connection with the period from July 1, 2002 through June 30, 2006. The claimant did not seek treatment at all between 2003 and 2007, and when she returned to see Dr. Naum in 2007, she indicated that she was not taking any medication, despite her complaints of incapacitating pain. While the undersigned

> acknowledges that the claimant lacked insurance coverage during this time, there is no indication that she ever sought treatment for her pain at an emergency room or urgent care center, nor did she seek treatment with any free clinic. It is also noted that the claimant has never sought treatment with a specialist for her condition. The undersigned notes that the June 2006 consultative evaluation of Dr. Sella did not show any significant neurological findings or limitation of range of motion. The claimant's ability to ambulate was normal at that time, and she was able to heel-toe walk, tandem walk and squat without difficulty.

(R. 40).

The magistrate judge noted that Pennington had not sought treatment at all for three (3) years prior to and eight (8) months after her DLI because she had no insurance. Social Security Ruling ("SSR") 82-59, 1982 WL 31384 (S.S.A. 1982), "Failure to Follow Prescribed Treatment" in the section titled "Justifiable Cause for Failure to Follow Prescribed Treatment," provides:

> The individual is unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable. Although a free or subsidized source of treatment is often available, the claim may be allowed where such treatment is not reasonably available in the local community. All possible resources (e.g., clinics, charitable and public assistance agencies, etc.), must be explored.

(SSR 82-59, 1982 WL 31384 at *4 (S.S.A. 1982).

Dr. Naum's records, however, contain only the following comments: "Pt. wasn't seen due to no insurance" (R. 466) and "there were some years she was unable to see me due to financial considerations" (R. 521). At the May 13, 2008, hearing, Pennington conceded that, even though she was aware free medical services were available, she did not seek treatment at these facilities because she "assumed based on income" that she probably would not qualify (R. 119-20). She further stated that "she had self-medication at home" (R. 120). She "used Nyquil to help me sleep, Benadryl. I would use Tylenol, Advil for pain" (R. 120). After reviewing the entire record, the magistrate judge concluded that the ALJ's determination that Pennington's failure to seek any type of treatment for this period adversely affected her credibility regarding her allegations of pain and its limitations was supported by substantial evidence.

Pennington argues that Dr. Naum is an expert in the field of pain and fibromyalgia, and relies on his January, 2008 letter, in which he stated that he was an "expert on this subject because I am certified in pain medicine and an expert in the treatment of fibromyalgia" (R. 454). The ALJ, however, noted that, on May 2,

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

2002, Dr. Naum had referred Pennington to Dr. Pellegrino, "one of the nation's leading experts on fibromyalgia" (R. 382). Thus, even though Dr. Naum apparently considered himself to be an expert on this subject, he thought it necessary to seek an opinion from Dr. Pellegrino. As to the two appointments Dr. Naum scheduled for Pennington with Dr. Pellegrino on June 13, 2002 and September 6, 2002, the ALJ noted that there was no evidence in the record from Dr. Pellegrino regarding any examination of Pennington (R&R 45-6).

The record also reflects conflicting statements from Pennington regarding her activities of daily living. During the May 31, 2008 hearing, Pennington stated that she stopped going to the grocery store in about 2000 or 2001, that her husband did the shopping for her because she had difficulty making it all the way through the store and that she only shopped for limited things, such as milk and bread, or ice cream, at a convenience-type store, every four to six weeks or so. Later on during the 2008 hearing, however, Pennington testified that at the time of her DLI in 2006, she grocery shopped, typically at Kroger's (R. 131).

Importantly, the ALJ did not reject Pennington's complaints of pain and limitation, but rather found that, even though the evidence of record established the medically-determinable severe

impairments of fibromyalgia, chronic fatigue, and depression, they failed, whether alone or in combination, to satisfy the criteria for a ruling of disability. Moreover, after noting that her residual functional capacity was strikingly limited for a person of her age, the ALJ limited her to sedentary jobs with sitting limited to six hours in an eight-hour workday, but for no more than 30 minutes at a time, standing and walking only two hours in an eight-hour workday and further limited to no more than 15 minutes at a time. He also limited her to simple, routine, one to three- step tasks not involving high production rates, such as in assembly line work or high sales quotas such as telemarketing work.

After careful review, the magistrate judge determined that the evidence of record supported the ALJ's finding that Pennington's statements concerning her pain and limitations were not entirely credible for the time period July 1, 2002, through June 30, 2006. Thus, appropriately he determined there was substantial evidence in the record for the ALJ's decision that Pennington was not disabled through June 30, 2006, her date last insured.

## VII. <u>CONCLUSION</u>

After consideration of Pennington's objections, the Court concludes that she has not raised any issues that were not

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

thoroughly considered by Magistrate Judge Kaull in his R&R. Moreover, the Court, upon an independent <u>de novo</u> consideration of all matters now before it, is of the opinion that the R&R accurately reflects the law applicable to the facts and circumstances before the court in this action. Therefore, it **ACCEPTS** and **ADOPTS** the magistrate judge's R&R in whole and **ORDERS** this civil action disposed of in accordance with the recommendation of the Magistrate Judge. Accordingly,

1. the defendant's motion for Summary Judgment (Docket No. 18) is **GRANTED**;

2. the plaintiff's motion for Summary Judgment (Docket No. 15) is **DENIED**; and

3. this civil action is **DISMISSED WITH PREJUDICE** and **RETIRED** from the docket of this Court.

Pursuant to Fed.R.Civ.P. 58, the Court directs the Clerk of Court to enter a separate judgment order and to transmit copies of this both Orders to counsel of record.

DATED: September 7, 2012.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE
